Mrs. Eva MADDOX et vir, F. W. Maddox, R. Murray Maddox and Willis H. Maddox, Plaintiffs,

v.

The TEXAS COMPANY, a corporation, J. C. Trahan and J. C. Trahan Drilling Contractor, Inc., a corporation, Defendants.

Civ. A. No. 1934.

United States District Court
E. D. Texas, Tyler Division.

Jan. 31, 1957.

Edwin M. Fulton, Gilmer, Tex., W. C. Hancock, Pittsburg, Tex., for plaintiffs.

Charles F. Potter, Tyler Tex., Neal Powers Carthage, Tex., for defendants.

SHEEHY, Chief Judge.

This suit was originally instituted by Mrs. Eva Maddox, et vir, F. W. Maddox, residents and citizens of the State of Texas, against The Texas Company, a Delaware corporation, and J. C. Trahan, a resident and citizen of the State of Louisiana, with plaintiffs seeking to recover from the defendants, a sum in excess of $3,000 for royalties plaintiffs claim are due them under an oil and gas lease covering certain lands owned by said plaintiffs in Panola County, Texas, which lands and oil and gas lease will be described hereinafter more particularly. On October 17, 1955, an order was entered herein dismissing this action as to the defendant, The Texas Company, because of the failure of the plaintiffs' complaint to state a cause of action against The Texas Company.

On and prior to October 29, 1945, F. W. Maddox and wife, Eva Maddox, were the owners in fee-simple title of a tract of land consisting of 184 acres, more or less, and located in the M. M. Clark Survey, Panola County, Texas. On October 29, 1945, F. W. Maddox and wife, Eva Maddox, executed and delivered to S. B. Cloyes an oil, gas and other minerals lease covering said tract of land, which said lease is recorded in Book 208, Page 548 of the Deed Records of Panola County, Texas, and which lease will hereinafter be referred to as the Maddox lease. On or about November 23, 1945, S. B.

Cloyes duly assigned said oil, gas and other minerals lease to The Texas Company. By instrument dated October 23, 1953, The Texas Company assigned or subleased to J. C. Trahan all of its right, title and interest in and to the Maddox lease insofar as said lease covers and affects the rights to prospect and drill for, produce, save and market gas and gas condensate from the lands covered by said lease. Subsequent to October 23, 1953, and prior to June 3, 1954, J. C. Trahan pooled 172.80 acres of the 184 acres covered by the Maddox lease with lands belonging to others into the J. C. Trahan-Mitchell Unit, Panola County, Texas, containing 641.05 acres. There is no question presented herein concerning the regularity of the creation of said unit. On June 3, 1954, a commercially producing well was completed on one of the tracts of land located in the J. C. Trahan-Mitchell Unit, which said well was completed in both the Pettit and Travis Peak zones, and which well has been producing from both zones continuously since the date of its completion. This well is in what is commonly called the Bethany Field. The reservoirs from which said well is produced are classified by the Railroad Commission of the State of Texas [1] as gas reservoirs.

Subsequent to the institution of this suit F. W. Maddox and wife, Eva Maddox, assigned and conveyed to R. Murray Maddox an undivided $\frac{1}{4}$ interest and to Willis H. Maddox an undivided $\frac{1}{4}$ interest in and to the oil, gas and other minerals in and under and that may be produced from the lands covered by the Maddox lease subject to the Maddox lease. Subsequent to R. Murray Maddox and Willis H. Maddox acquiring their respective interests in the oil, gas and other minerals in and under the lands covered by the Maddox lease, they came into this suit as additional party plaintiffs and are now before the Court as plaintiffs along with F. W. Maddox and wife Eva

[1.] The responsibility for the regulation of the drilling for and producing of oil and gas in the State of Texas has been delegated by the Legislature of Texas in a substantial degree to the Railroad Commission of Texas. See Title 102, Vernon's Annotated Civil Statutes of Texas.

Maddox. During the pendency of this suit J. C. Trahan transferred to J. C. Trahan Drilling Contractor, Inc., a Delaware corporation, all of his interest in the Maddox lease and all other leases, contracts and agreements hereto pertinent. Following that transfer J. C. Trahan Drilling Contractor, Inc. was made a party defendant herein and has duly appeared and answered herein.

In June, 1954, Trahan and a number of other owners of oil and gas leases in the Bethany field entered into a processing agreement or contract with one E. J. Hudson, whose subsidary is the Carthage Company, the owner and operator of a large natural gas processing plant in Panola County, Texas, which contract or agreement will hereinafter be referred to as the Carthage Company contract. The contract was for a period of 20 years and under its terms Trahan and the other owners of oil and gas leases sold and assigned to the Carthage Company the right to extract and process the natural gasoline, condensate and other products contained in the gas produced from the wells, including the Maddox well, on the leases covered by the contract during the life of the contract. The contract which is lengthy and somewhat complicated provides, in effect, that the Carthage Company, whose plant is located some seven or eight miles from the Maddox well will take the full stream gas production from the wells, including the Maddox well, in its pipe line and transport it to its processing plant where the condensate, natural gasoline and other products contained in the gas are to be separated from the gas and manufactured into propane, butane and other products, which propane, butane and other products are then to be marketed. The residue dry gas is to be delivered to Tennessee Gas Transmission Company which purchases it under its contract with Trahan and others, which contract will be mentioned hereinafter more particularly. Under the terms of the Carthage Company contract the Carthage Company is to be paid by the lease owners one cent per MCF of gas taken from the wells covered by the contract as

a gathering and delivering charge and for its services in processing the gas taken from the wells covered by the contract the Carthage Company is to receive 45% and the lease owners 55% of the plant products manufactured by the Carthage Company until the Carthage Company receives the sum of $91,250 from each well, and thereafter the Carthage Company is to receive only 25% of said plant products. The Carthage Company contract provided for the allocation of the production of the gas taken by it under the contract to each well on the basis of a formula set out in said contract.

Simultaneously with the making of the Carthage Company contract Trahan and other owners of oil and gas leases in the Bethany Field entered into a contract with the Tennessee Gas Transmission Company, under the terms of which contract the Tennessee Gas Transmission Company was to purchase the residue gas remaining after the gas taken from the Maddox well and other wells covered by the contract had been processed by the Carthage Company. The primary term of that contract was 25 years and under the terms of the contract Tennessee Gas Transmission Company was to pay for said residue gas during the period up to November 1, 1954, the sum of 7.02738 cents per MCF; during the period from November 1, 1954, to November 1, 1959, the sum of 12.5 cents per MCF; for the period from November 1, 1959, to November 1, 1964, the sum of 13.5 cents per MCF; for the period from November 1, 1964, to November 1, 1969, the sum of 14.5 cents per MCF; for the period from November 1, 1969, to November 1, 1974, the sum of 15.5 cents per MCF; and for the period from November 1, 1974, to the expiration of the contract the sum of 16.5 cents per MCF.

All of the production from the Maddox well at all times pertinent hereto has been taken full stream from the well by the Carthage Company. The production from the Maddox well is commingled with the production from the other wells covered by the Carthage Company con-

tract and upon the commingled production reaching the Carthage Company plant it is sent through a separator and flash tanks as a result of which process the condensate is removed. After the condensate is removed by that process the gas is then sent into absorption towers where additional liquids are extracted from the gas. The gas that remains after the absorption tower process is then sent through a dehydrator and then delivered to the Tennessee Gas Transmission Company, in accordance with its contract, above referred to. By the use of a fractionation process the Carthage Company manufactures the condensate and liquids into hydrocarbon products which products are then sold. The Carthage Company retains 45% of the proceeds of the sale of such products and delivers to the lease owners 55% of the proceeds of such sale until the Carthage Company has received the sum of $91,250 from each well on the basis of the formula of allocation of production to each well contained in the contract, and after the Carthage Company has received said sum of $91,250 from each well it retains only 25% of the proceeds of the sale of such products.

Since the Maddox well is produced from two separate formations, it, within the meaning of the Carthage Company contract, is treated as two wells. In August, 1956, the production from the Pettit formation of the Maddox well reached the point where the Carthage Company had received from the sale of its share of the plant products manufactured from the gas taken from that formation the sum of $91,250. Therefore, since August, 1956, the Carthage Company has received only 25% of the products manufactured by it from production from the Pettit formation of the Maddox well. It appears from the evidence that in all reasonable probability the production from the Travis Peak formation of the Maddox well will be such that by approximately July, 1957, the Carthage Company will have received from the sale of its part of the plant products manufactured from the gas taken from the Travis Peak formation of the Maddox well the sum of $91,250.

In accounting to the owners of royalty, including plaintiffs, under the lands covered by the Trahan-Mitchell Unit, Trahan has paid or tendered payment to said royalty owners on the basis of 1/8 of the sum he received under the Carthage Company contract for the sale of products processed and manufactured by the Carthage Company from the production of the Maddox well, less 1/8 of the gathering and transportation charge of one cent per MCF made by the Carthage Company for the production taken from the Maddox well, and 1/8 of the amount received by Trahan from the Tennessee Gas Transmission Company under its contract, above referred to, for the residue gas taken by the Tennessee Gas Transmission Company from the gas produced from the Maddox well.

The plaintiffs have contended at all times that the royalty due them was in excess of that tendered by Trahan and have at all times refused to accept said royalty so tendered by Trahan as the full royalty due them. However, under an agreement in writing between the plaintiffs and Trahan the plaintiffs have accepted the amounts of royalty tendered them by Trahan without prejudice to plaintiffs' rights to claim and to seek to recover royalty on a different basis and in a greater amount.

The Royalty Clause of the Maddox lease is paragraph 3 thereof, and the provisions thereof pertinent hereto are:

"The royalties reserved by Lessor, and which shall be paid by Lessee, are, except as otherwise provided herein: (a) on oil, distillate, and condensate, one-eighth (1/8th) of that produced and saved from the leased premises, the same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; provided, however, Lessee may from time to time purchase such royalty oil, distillate, and condensate, paying therefor the current market price at

the wells in the field or area for oil (crude) having the same or nearest to the same gravity; provided, further, that as to any distillate or condensate, either or both, which is separated into some of its components by fractionation and marketed or used off the leased premises, the royalty to be paid Lessor by Lessee shall be one-eighth (⅛th) of the value of an equal volume of oil (crude) at the current market price at the wells in the field or area for oil (crude) having a gravity nearest to the gravity which all such components of the distillate or condensate would have if blended; Lessor's interest shall bear its proportion of any expense of treating unmerchantable oil, distillate or condensate to render it merchantable as a crude product, but not of separating distillate or condensate into components by fractionation; (b) on gas (including casinghead gas and other vapors) produced from said land and sold or used off the leased premises or in the manufacture of gasoline or other product, *the current market price at the wells* (or, if there be none, then the current market price at the wells in the nearest field where there is a market price at the wells for gas of similar quality) of one-eighth (⅛th) of the gas so sold or used; Lessor's interest shall bear its proportion of any compression, treating, and other expenses necessary to render the gas merchantable." (Emphasis supplied.)

As I understand plaintiffs' contention they contend that Section (a) of the Royalty Clause above quoted covers the condensate and other liquids extracted by the Carthage Company from the gas produced from the Maddox well, and that being true, they are entitled to be paid for the condensate and other liquids extracted from said gas on the basis of ⅛ of the market price at the well for such condensate and other liquids, which market price at the well was stipulated by the parties hereto to be the sum of $2.90 per barrel. As to the dry gas delivered to and sold to the Tennessee Gas Transmission Company, the plaintiffs contend that Section (b) of the Royalty Clause applies, and under that section they are entitled to be paid royalty for said gas on the basis of ⅛ of the value at said well of such gas after deducting therefrom their proportionate part of the processing cost necessary to render the gas merchantable.

The defendants contend that the royalty to be paid the plaintiffs for the production from the Maddox well is the royalty provided for in Section (b) of the Royalty Clause, and that the defendants have paid to the plaintiffs the full royalty provided for by said Section (b). In my opinion the contention of the defendants is correct.

██ The two reservoirs from which the Maddox well was produced were gas reservoirs. The Maddox well was classified by the Railroad Commission of Texas as a gas well as to its production from each of the two formations from which it is produced. The substance produced from the Maddox well was gas and remained in a gaseous form until it reached the Carthage Company plant and was there subjected to a manufacturing process. Although the condensate element and other liquid elements were in the gas when it came from the well, the substance produced from the well was still gas and remained such until it was subjected to the manufacturing process at the Carthage Company plant.[2] To me it is clear that the disposition of the production by Trahan from the Maddox well under the Carthage Company and Tennessee Gas Transmission Company contracts, above referred to, was an off the leased premises sale and use of the gas within the meaning of Section (b) of the Royalty Clause, but even if I should be mistaken in that respect, the gas produced from the Maddox well was certain-

2. Lone Star Gas Co. v. Stine, Tex.Com. App., 41 S.W.2d 48, 82 A.L.R. 1299; and

Humble Oil & Refining Co. v. Poe, Tex. Com.App., 29 S.W.2d 1019.

·ly used in the manufacture of gasoline or other products within the meaning of said Section (b).

■ There was evidence to the effect that some operators in the oil and gas industry when producing wet gas similar to the gas produced from the Maddox well install some type of mechanical separator on the leased premises near the well and by causing the wet gas to flow through such mechanical separator separate a substantial portion of the condensate that is in the gas as it is produced from the well. Trahan used no such mechanical separator on the premises of the Maddox well. If he had used such a separator and thereby separated the condensate from the gas before the gas left the leased premises, I am inclined to the view that the plaintiffs would have been entitled to a royalty on the condensate so saved as provided for in Section (a) of the Royalty Clause. Was Trahan under the duty to separate the condensate from the gas through the use of a mechanical separator on the Maddox well premises? I think not. Under the terms of the Maddox lease title to all of the gas in and under the lands covered by said lease passed to the lessee,[3] and therefore Trahan had the right to remove said gas from the leased premises and to do with it as he saw fit so long as he paid plaintiffs on said gas the royalty provided for by Section (b) of the Royalty Clause.[4]

■ What royalty was Trahan or his successor in title obligated to pay plaintiffs under Section (b) of the Royalty Clause? The clause itself provides, in effect, that he was to pay the current market price at the well of ⅛ of the gas sold or used off the leased premises or in the manufacture of gasoline or other products, and if there was no current market price at the well, then he was to pay the current market price at the wells in the nearest field where there is a market price at the wells for gas of similar quality of ⅛ of the gas so sold or used. The clause further provides that lessor's interest shall bear its proportion of any treating or other expenses necessary to render the gas merchantable. The parties stipulated that there was no current market price at the Maddox well for the gas produced at the well at any time pertinent hereto, and I find from the evidence that there was no current market price at any time pertinent hereto at any well in any other field for gas of similar quality to the gas produced from the Maddox well. Under those circumstances the royalty payable must be determined on the basis of "fair value" or "actual value" of the gas produced from the Maddox well at said well at the times pertinent hereto.[5] In a case such as this all the facts and circumstances which shed light upon the "actual value" or "fair value", including the cost of transporting and preparing the production for market, must be considered. It would serve no useful purpose to here discuss the various facts and circumstances in evidence in this case that tend to show the "fair value" or "actual value" of the gas produced from the Maddox well. It will suffice to say that I am of the opinion that the evidence shows and I so find that the "fair value" or "actual value" of the gas produced from month to month from the Maddox well was the amount that Trahan and his successor in title received for such gas from month to month under the Carthage Company and Tennessee Gas Transmission Company contracts, above referred to, and since Trahan and his successor in title have fully accounted to and paid plaintiffs from month to month on the basis of ⅛ of the amount received by Trahan and his successor in title under said contracts, Trahan and his successor

3. Gulf Production Co. v. Taylor, Tex. Civ.App., 28 S.W.2d 914; and Phillips Petroleum Co. v. Bynum, 5 Cir., 155 F. 2d 196, 199.

4. Lone Star Gas Co. v. Stine, supra.

5. Phillips Petroleum Co. v. Williams, 5 Cir., 158 F.2d 723; Phillips Petroleum Co. v. Johnson, 5 Cir., 155 F.2d 185; Shamrock Oil and Gas Corporation v. Coffee, 5 Cir., 140 F.2d 409; and Sartor v. United Gas Public Service Co., 5 Cir., 84 F.2d 436.

in title have paid plaintiffs in full for all royalty due them to date on the production from the Maddox well.

In light of the findings and conclusions hereinabove made it follows that plaintiffs are not entitled to recover herein and that judgment should be entered to the effect that plaintiffs take nothing of and from the defendants and that all costs herein be adjudged against the plaintiffs, jointly and severally.

This memorandum decision will constitute the findings of fact and conclusions of law herein as authorized by Rule 52, Fed.Rules Civ.Proc. 28 U.S.C.A.