Mary Ellen Francis **VERNON** and husband, **H. J. Vernon**, Appellants,

v.

**UNION OIL COMPANY OF CALIFORNIA** et al., Appellees.

No. 17502.

United States Court of Appeals
Fifth Circuit.

Sept. 18, 1959.

Jones, Circuit Judge, dissented.

W. H. Brian, Amarillo, Tex., Albert Smith, Lubbock, Tex., Sanders, Scott, Saunders, Brian & Humphrey, Amarillo, Tex., for appellants.

H. A. Berry, W. M. Sutton, Riley Strickland, Underwood, Wilson, Sutton, Heare & Boyce, Amarillo, Tex., for appellee, Union Oil Co. of California.

Before RIVES, Chief Judge, and CAMERON and JONES, Circuit Judges.

RIVES, Chief Judge.

This is an action to try title to certain land located in the State of Texas, brought by the appellants (hereinafter referred to as the lessors) against the appellee (hereinafter referred to as the lessee) to obtain a judicial declaration of the termination of an oil, gas and mineral lease between the parties. The lease in question was entered into on December 5, 1951, and provided, inter alia:

> "Subject to the other provisions herein contained, this lease shall be for a term of five years from this date (called 'primary term') and as long thereafter as oil, gas or other minerals is produced from said land hereunder.
>
> \*      \*      \*      \*      \*      \*

> "\*   \*   \* where gas from a well producing gas only is not sold or used, Lessee may pay as royalty $50.00 per well per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph 2 hereof. \*   \*   \*."

Pursuant to this lease, on May 31, 1956, the lessee commenced the drilling of a well. The drilling operation ended successfully on July 6, 1956, and the completed well was tested a few days later on July 23. The results of that test indicated that the well had a potential yield of 25,000,000 cubic feet of gas and approximately 312.5 barrels of liquid condensate per day. After this test, the well was shut in and was not actually put into production until March 5, 1957. It is undisputed that the continued vitality of the lease is wholly dependent upon this one well, for no other attempt was made to exploit the land covered by the lease during the relevant period.

The lessors' position is that the lease terminated for nonproduction on December 5, 1956, the expiration date of the primary term. In support of this position, they contend that the effect of the absence of actual production at that time cannot be avoided by reliance upon the provision permitting constructive production of wells "producing gas only" on the grounds, first, that the well was not a well "producing gas only" within the meaning of the lease, and, secondly, that, even if the well was "producing gas only," the lessee failed to perfect constructive production by a proper tender of the specified royalty payments.

In addition to joining issue with the lessors on the questions of the nature of the well and the validity of the tenders, the lessee has presented, as an additional defense, the contention that the lease contains an implied provision granting the lessee a reasonable time within which to market any oil, gas, or minerals discovered within the primary term and that, under the facts of this case, such provision operated to prevent termination of the lease.

Each party's motion for a directed verdict was denied, and six special issues were submitted to the jury, each of which was answered favorably to the lessors.[1] The lessors' request that the ultimate issue as to whether the well was a well "producing gas only" be submitted to the jury was refused, as was the lessors' request for submission of an issue relating to the validity of the royalty tenders.

Upon motion by the lessee for judgment notwithstanding the verdict, the trial judge set aside the jury's findings on special issues 3, 4, 5 and 6 as lacking support in the evidence and entered judgment for the lessee on the ground that the evidence showed as a matter of law that the well in question was "producing gas only" and that the lessee had made valid tenders of the required shut-in royalties.[2] In this appeal, the lessor has attacked each of the aforementioned rulings.

At the outset, we may dispose of the lessors' challenge to the various tenders made by the lessee of the required shut-in royalties. A total of four such tenders were made. The first tender was made on October 23, 1956. At that time a check for $25 was sent to the lessors. The amount of this check, which represented 50 per cent of the required shut-in royalty, was premised upon the theory that at the time of the execution of the lease the present lessors owned only 50 per cent of the land covered by the lease and, since the lessee had not been properly informed of any change in ownership of the land, it was bound to make payments as originally prescribed in the lease.

The lessors attack this tender on three distinct grounds. First, as to the amount, the lessors contend that the lessee was obligated under the lease to know of the change of ownership since that

---

4. The six issues submitted to the jury and the jury's answers were as follows:

"*Special Issue No. 1:* Do you find from a preponderance of the evidence that the defendant Union Oil Company had the G. W. Francis well connected and delivering gas to the Panhandle Eastern market pipe line within a reasonable time under all the attending circumstances?

"Answer 'Yes' or 'No'.

\* \* \* \* \*

"*Special Issue No. 2:* Do you find from a preponderance of the evidence that before this suit was filed on December 21, 1956, the defendant Company had acted with reasonable diligence in the efforts being made to complete the marketing arrangements and authority for the sale of gas from the well in question?

"Answer 'Yes' or 'No'.

"*Special Issue No. 3:* Do you find from a preponderance of the evidence that the product of this well flowing at the wellhead contains a substantial quantity of liquified [sic] hydrocarbons forming a common body of the liquid condensate?

"Answer 'Yes' or 'No'.

"*Special Issue No. 4:* Do you find from a preponderance of the evidence that practically all the product of said well flowing at the wellhead is then in the gaseous state or phase?

"Answer 'Yes' or 'No'.

"*Special Issue No. 5:* Do you find from a preponderance of the evidence that any process of condensation at the wellhead when said well flows is confined to minute particles of vapor liquid still mixed in the gas column and not coalesced into a separate body of liquid condensate?

"Answer 'Yes' or 'No'.

"*Special Issue No. 6:* Do you find from a preponderance of the evidence that substantially all the liquid condensate from this well is precipitated by the functions brought to bear in the separator?

"Answer 'Yes' or 'No'."

The jury returned its verdict as follows:

"We, the Jury, in answer to the Special Issues herein, return our verdict, as follows:

| | |
|---|---|
| "*Special Issue No. 1.:* | No |
| Special Issue No. 2.: | No |
| Special Issue No. 3.: | Yes |
| Special Issue No. 4.: | No |
| Special Issue No. 5.: | No |
| "*Special Issue No. 6.:* | No." |

2. Viewing it as unnecessary to the disposition of the case, the learned trial judge declined to pass upon the legal acceptability of the jury's answers to special issues 1 and 2 relating to the lessee's defense of reasonable efforts to market.

change resulted from a judgment of partition rather than a conveyance. Thus, the tender of $25 was insufficient in amount. Secondly, the lessors contend that, because the tender was by a check upon which was printed

"This check is in full payment of drilling deferment rental hereby paid the party or parties named below under the terms of an oil and gas lease described below for the period stated and now held by Union Oil Company of California,"

the tender was ineffective because it imposed a condition contrary to the terms of the lease. The lessors contend that the vice of this printed condition was not cured by the typewritten words on the same check which stated:

"Covering as payment for shut in gas well located on the following described land: All of Surveys 11, 12, 16, 17, 18 and 26, Block 1, Cherokee Furnace Company Original Grantee, all in Hansford County, Texas."

Finally, the lessors attack this first tender because it was accompanied by a letter which stated that the enclosed check was "payment for shut-in gas well royalties on the captioned land for period from December 5, 1956, to December 5, 1957." The lessors contend that the proper period for payment under the lease would have been the year immediately following the shutting-in of the well rather than the year following expiration of the primary term. Thus, the first tender would be ineffective because it purported to continue the lease beyond July 23, 1957, the proper limit under the lessors' construction.

The second tender was made on November 27, 1956. This tender consisted of an offer of $50 in cash to the lessors as payment for shut-in royalties without any mention of the conditions under which the offer was being made.

The lessors contend that the circumstances of the second tender were such as to import into that tender the objectionable conditions of the first. Thus, all of their objections to the first tender (except that as to amount) are pressed as equally applicable to the second.

The third tender, a $50 cash tender made on November 28, 1956, was in all relevant respects identical to the second and is attacked on the same theory.

The fourth tender, by $50 check on December 5, 1956, was identical to the first (again except as to amount) and is attacked in the same manner.

As an absolute prerequisite to any possibility of success in the challenge of these tenders, it is imperative that it be shown that the second and third tenders were not independent of the others. This is so because the second and third tenders were, apparently at least, unconditional and could only become conditional by implication from the others. The record shows merely that, first, a conditional tender was made; then, two unconditional tenders were made; and, finally, another conditional tender was made. There is absolutely no evidence in the record to indicate that the second and third tenders were not exactly what they appeared on their face to be, i. e., unconditional tenders of the shut-in royalties due under the lease. The lessee was under no obligation to accompany these tenders with a proper construction of the lease. This is so even though an earlier tender may[3] have been accompanied by an improper construction of the lease. The learned trial judge was therefore correct in holding the tenders effective as a matter of law.

We are thus squarely confronted with the necessity of determining the proper interpretation of the phrase "a well producing gas only." In approaching this problem, it is necessary to keep in mind the fact that we are dealing with an integral part of the habendum clause of the lease here in question. The con-

---

3. Since we find the second and third tenders to have been independent of the first and fourth, we find it unnecessary to decide whether the first and fourth imposed conditions which rendered them ineffective.

siderations which must govern our construction of this clause are well settled:

"Under the law of Texas, the lessee's estate created by an oil and gas lease, such as the one in this case, is a determinable fee, and the 'thereafter' or 'production' clause is a special limitation upon the lessee's estate. Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290 [29 A.L.R. 566]; Caruthers v. Leonard, Tex.Com.App., 254 S.W. 779; Carrothers v. Stanolind Oil & Gas Co., D.C.N.D.Tex., 134 F.Supp. 191, 193; 7 Texas Law Review 541; see also, 31 C.J.S. Estates § 10; 19 Am.Jur., Estates, § 28.

" 'It appears to be very well settled that under the terms of the lease, upon cessation of production after termination of the primary term, the lease automatically terminated. W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27.' Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 784, 137 A.L.R. 1032.

"As said by this Court in Empire Gas & Fuel Co. v. Saunders, 5 Cir., 22 F.2d 733, 735, ' * * * equitable rule as to relieving against forfeiture has no application to the facts of this case, for there was no forfeiture; there was nothing to be forfeited, because the lease by its very terms had ceased to exist.' According to Mr. A. W. Walker's article in 8 Texas Law Review 511:

" 'Neither unavoidable delays or accidents, acts of God, unfavorable economic conditions, nor financial difficulties of the lessee will afford an excuse for the failure to comply literally with the provisions of this clause in the absence of an express stipulation otherwise contained in the lease.' " [4]

With these principles firmly in mind, we move to a consideration of the words of the lease.

On a purely verbal level, the three key words—"producing," "gas" and "only"—are each subject to conflicting interpretations. Thus, the lessee contends that "producing" means no more than bringing to the surface and that the process whereby the liquid condensate comes into being is a manufacturing process, and not a production process.[5] The lessors, on the other hand, contend that "producing" encompasses all steps necessary to prepare the gas for market.

The conflict is even more accentuated with regard to the proper interpretation of the word "gas." In keeping with its aforementioned interpretation of "producing," the lessee contends that "gas" comprehends all substances which exist in a gaseous state in the reservoir. Alternatively, it contends that "gas" comprehends all substances in a gaseous state upon arrival at the surface. The application of either test, it contends, places liquid condensate squarely within the definition of "gas." The lessors, on the other hand, urge that "gas" means no more than that substance which, under normal production operations, is marketed and sold in a gaseous state. Thus, under the lessors' views, liquid condensate is not gas.

Finally, the lessee contends that the word "only" is designed merely to exclude wells productive of oil from the constructive production provision, whereas the lessors contend that "only" is designed to limit the provision to wells from which only gas is marketed.

Considered alone, this conflict would be difficult, if not impossible, to rationally resolve. Each interpretation suggested is possible and each has been supported by presentation of a formidable array of authorities. Fortunately, however, we find it unnecessary to approach the prob-

---

4. Haby v. Stanolind Oil & Gas Company, 5 Cir., 1955, 228 F.2d 298, 305. See also, Mattison v. Trotti, 5 Cir., 1959, 262 F.2d 339, 341–342.

5. The process here under discussion is that referred to in the gas industry as separation. None of the liquid condensate involved was recovered by the more complex process known as fractionation.

lem in such a semantical fashion. Rather, we must look to the purpose of the constructive production provision and adopt the construction most consonant with that purpose.

This purpose was quite accurately stated by the learned trial judge in his oral opinion granting the lessee's motion for judgment notwithstanding the verdict:

> " * * * The origin of such a lease provision does not seem to be shrouded in any doubt. The reason that this kind of a provision has come into growing use during the last twenty-five years goes back to the inherent physical nature of natural gas. Unlike oil, it cannot be produced and stored or transported in railroad cars or tank trucks. A lessee completing a gas well consequently often had a special and quite onerous problem in finding a market outlet for his gas production. This would, at times, result in losing a lease at the end of the primary term and the dissipation of all prospect for profit from the lessee's development investment. Of course, the self-interest of lessees was behind the introduction of this particular provision, but they had a fair case for some reasonable measure of protection." [6]

█ When the words "producing gas only" are considered against the background of this purpose, much of their apparent ambiguity disappears. The distinguishing attributes of gas which gave rise to the provision are the difficulties of storage and transportation. These attributes became important only because they were possessed by gas after it had been brought to the surface and prepared for market. Reservoir conditions were important only insofar as they affected the state of the final product. Liquid condensate, not being possessed of these attributes *at the critical point*, i. e., when prepared for market, is not therefore "gas" within the intendment of the constructive production provision.

It does not, however, necessarily follow that the well here in question is not a well "producing gas only." It is well known in the gas industry, as shown in this record, that nearly all gas wells produce some liquid condensate. A holding that the constructive production provision applies only to wells producing no liquid condensate would render that provision almost nugatory. We do not view the provision as intended to be limited to such narrow scope. Its purpose, as set out above, is to protect the lessee against loss of his lease when production from a well is impossible because of the absence of a readily accessible market for gas, and the further absence of any reasonable and legally permissible use for the gas. Where a well is capable of producing only negligible quantities of liquid condensate, the need for such protection persists. In such a case, the constructive production provision would be applicable. But where the well is capable of producing liquid condensate in paying quantities,[7] i. e., where it would be reasonable to operate the well to produce liquid condensate alone,[8] the need for protection ceases as does the application of the constructive production provision.

6. And see Summers, The Law of Oil and Gas, § 299.

7. The interpretation here given to the word "producing," i. e., producing in paying quantities, is not a novel one. On the contrary, it is the same interpretation which that word consistently receives when it appears in the habendum clause of an oil and gas lease. Garcia v. King, 1942, 139 Tex. 578, 164 S.W.2d 509. Since the constructive production provision is, strictly speaking, a part of the habendum clause, it seems only sensible to presume that "producing" has the same meaning throughout that clause.

8. Such an operation is known in the industry as cycling. For a discussion of the history of cycling, see Phase Relations of Gas-Condensate Fields, Vol. 1, published by the American Gas Association.

The case was submitted to the jury upon an erroneous interpretation of the constructive production provision. The jury's disposition of the special issues propounded to it in relation to this provision does not dispose of the case, whether supported by the record or not —a question we do not reach. In the absence of more appropriate special issues, the trial court erred in refusing the appellants' requested issue No. 1, asking the jury whether or not the well was a well producing gas only.[9] The case must, therefore, be remanded for a new trial.[10]

Reversed and remanded.

JONES, Circuit Judge (dissenting).

I cannot agree with the holding of the Court that there is ambiguity in the phrase "producing gas only". There are, of course, differences between "dry gas" and "wet gas" as well as many other distinctions and gradations. It does not seem to me that there is anything in the instrument before the Court that permits of a construction that "gas only" may mean only dry gas. Applicable, so it seems to me, is the following:

"An examination of the several instruments clearly discloses that the gas conveyed was not limited to any particular kind or character of gas, but the conveyance is all-embracing as regards gas, and covers and includes 'all natural gas'. The term 'all natural gas' would include all the substances that come from the well as gas, and that regardless of whether such gas be wet or dry. It is undisputed in the evidence that the term 'natural gas' includes numerous elements or component parts, but the very language of the conveyance is such as to include therein all these component parts which were gaseous when they came from the wells." Lone Star Gas Co. v. Stine, Tex.Com.App., 41 S.W.2d 48, 49, 82 A.L.R. 1299. See Humble Oil & Refining Co. v. Poe, Tex.Com.App., 29 S.W.2d 1019; Maddox v. Texas Company, D.C.E.D.Tex.1957, 150 F. Supp. 175; Sullivan, Handbook of Oil and Gas Law, pp. 15, et seq.

Being unpersuaded that the district court was in error, I respectfully dissent.

9. Such an ultimate mixed question of fact and law could properly be submitted only if the jury were adequately instructed as to the meaning of the phrase "a well producing gas only" as used in the lease. Jackson v. King, 5 Cir., 1955, 223 F.2d 714, 718.

10. This disposition of the case renders it unnecessary for us at this time to pass upon the questions: (1) whether the lessee did in fact exercise reasonable diligence to market the products of the well; and (2) whether, under Texas law, a provision would be implied extending the term of the lease in the event the lessee exercised such diligence. Compare Holchak v. Clark, Tex.Civ.App.1955, 284 S.W.2d 399, with Union Oil Company of California v. Ogden, Tex.Civ.App.1955, 278 S.W.2d 246; Upshaw v. Norsworthy, Tex.Civ.App.1954, 267 S.W.2d 566; Mitchell v. Perkins, Tex.Civ.App.1953, 266 S.W.2d 451; Bain v. Strance, Tex. Civ.App.1953, 256 S.W.2d 208.

See also, Cole Petroleum Co. v. United States Gas & Oil Co., 1931, 121 Tex. 59, 41 S.W.2d 414, 86 A.L.R. 719; Summers, The Law of Oil and Gas, §§ 299, 300; Walker, The Nature of the Property Interests Created by an Oil and Gas Lease in Texas, 8 Texas L.Rev. 483, 518; Veasey, The Law of Oil and Gas, 19 Mich.L.Rev. 161, 182; 31-A Texas Jur., Oil and Gas, § 135.