**EVANS PRODUCTION CORPORATION, Appellant,**

v.

**Don J. SHAW, Appellee.**

**Don J. SHAW, Cross-Appellant,**

v.

**EVANS PRODUCTION CORPORATION, Cross-Appellee.**

**No. 17931.**

United States Court of Appeals
Fifth Circuit.
March 30, 1960.

---

7. See 7 U.S.C.A. §§ 205, 208, 213.

R. G. Storey, Hubert D. Johnson, Dallas, Tex., Mahlon E. Lewis, Pittsburgh, Pa. (Carrington, Johnson & Stephens, Storey, Armstrong & Steger and Robert M. Martin, Jr., Dallas, Tex., of counsel), for appellant.

Frank J. Scurlock, Dallas, Tex. (James W. Leftwich, Turner, Rodgers, Winn, Scurlock & Terry, Dallas, Tex., of counsel), for appellee.

Before RIVES, Chief Judge, and JONES and BROWN, Circuit Judges.

RIVES, Chief Judge.

This action was commenced by Don J. Shaw against the Evans Production Company and was based upon a letter agreement between the parties dated May 28, 1953. The agreement in question, which is set out in full in the margin,[1]

---

[1] "Evans Production Corporation
"1932 Oliver Building
"Pittsburgh 22, Pa.
                    "May 28, 1953
"Mr. Don J. Shaw
"4516 Versailles Street
    "Dallas, Texas
"Dear Mr. Shaw:
"To enable you to obtain a proprietary interest in the affairs of Evans Production Corporation, the Company has assisted you in financing the purchase of 483 shares of Common Stock without par value—stated value $50.00 per share of Evans Production Corporation Common Stock (hereinafter referred to as 'stock') at its book value March 31, 1953 or $106.25 per share. As security for this advance, you have given us your note (hereinafter referred to as 'note') to-gether with the 483 shares of 'stock,' (with stock assignment form or forms duly executed) so purchased by you, as collateral security for this advance.

"As an incentive for you to work for the best interests of Evans Production Corporation and to assist you in your realization of the results of such efforts, the Company agrees that;

"(1) After you have owned the aforesaid 'stock' and have been in the continuous employ of the Company for a period of two years from this date, upon your one and only written request to be made at any time between May 28, 1955 and within ten days after May 28, 1958, the Company will purchase all of said 'stock' at its book value as shown by the Company's annual statement for the year ending March 31 last preceding the

provided for the purchase by Shaw of 483 shares of common stock in Evans with the right to re-sell this stock to Evans at a subsequent date.[2] The price to be paid by Shaw in the original purchase was specified in the agreement at $106.25 per share, thus making the total original purchase price $51,318.75 for the 483 shares. The price to be paid by Evans for the return of the shares in the event Shaw elected to exercise his option to re-sell was not specified with this same exactitude. Rather, the agreement attempted to set up a method by which that price could be ascertained by reference to the financial condition of the company at the time of the election.

Shaw bought the stock as contemplated by the agreement and, by letter dated January 22, 1957,[3] attempted to exercise his right to re-sell. A controversy ensued as to the price which, under the agreement, Evans was obligated to pay for the shares. This controversy was never resolved and eventually resulted in this litigation. The controversy revolves about the interpretation to be given to the following language of the agreement:

"* * * the Company will purchase all of said 'stock' at its book value as shown by the Company's annual statement for the year ending March 31 last preceding the date of your request, plus a value of $.50 a barrel for proven oil reserves of the Company."

Shaw took the position that this provision bound Evans to re-purchase the stock at a price to be determined by adding to the book value of the stock fifty cents for each barrel of proven oil reserves belonging to Evans as of January 22, 1957, when he chose to exercise his option to re-sell. Since the proven oil reserves on that date totaled 611,384 barrels, Shaw's position was that the proper re-purchase price for his 483 shares was $452,596.03. Evans, on the other hand, took the position that the re-

date of your request, plus a value of $.50 a barrel for proven oil reserves of the Company.

"(2) The Company has, at its own expense, taken out a five year $50,000.00 convertible and renewable term life insurance policy upon your life. The beneficiary of the policy is Evans Production Corporation and in the event of your death during the original five year term of this policy and provided your death occurs while in the employ of the Company, the Company will apply the insurance proceeds and other money if necessary to purchase the aforementioned stock at its book value as shown by the Company's annual statement for the year ended March 31, preceding your death, plus a value of $.50 a barrel for proven oil reserves of the Company, provided the properly authorized executor or administrator of your estate, within 60 days after your death, makes a written request of the Company to purchase said stock.

"(3) If at any time, prior to two years from the date of this letter, there is an unpaid balance on the note and you leave the employ of the Company or desire to secure a refund of the monies paid on account of the note, the Company will upon your written request refund without interest all payments made upon the prin-

cipal of the note and look only to the collateral pledged under the note for payment of the note which note automatically becomes due and payable.

"You agree that after or simultaneously with the Company's purchase of said stock at your request or the refund of any monies that this letter will be surrendered to the Company and that there shall be no waivers of any of the provisions or conditions of this letter for any reason whatsoever.

"Your signed acceptance of one copy of this letter will constitute acknowledgment that this letter is given voluntarily by the Company and is the entire agreement between the Company and yourself and pertains only to the specific 483 shares of 'stock' aforementioned.

"Yours very truly,
"T. M. Evans,
"President.

"Accepted:
"Don J. Shaw."

2. The agreement limited the period during which Shaw could exercise this right to re-sell to a period beginning May 28, 1955, and ending within ten days after May 28, 1958.

3. Which date was within the limitation described in note 2, supra.

purchase price was to be calculated by first adding fifty cents a barrel for proven oil reserves to the assets of the company as reflected in its annual statement of the March 31 preceding Shaw's election, and, then determining the book value of the 483 shares. Since there were 9667 shares of stock outstanding, this method of calculation produced a price of $81,676.75.

The real gist of the argument, therefore, has been whether Shaw is entitled to the full fifty cents for each barrel of proven oil reserves, as would be the case under his interpretation of the agreement, or is entitled to only 483/9667 of fifty cents for each barrel of proven oil reserves, which would follow from Evans' interpretation.

The district court held that the agreement itself was ambiguous and, consequently, permitted the introduction of extrinsic evidence relating to the circumstances surrounding the execution of the agreement. The case was then submitted to the jury under two special issues, both of which were answered favorably to Shaw.[4] Evans' motions for judgment notwithstanding the verdict and for a new trial were denied and judgment was entered in favor of Shaw in the amount of $452,596.03. In doing so, the district court rejected Shaw's requests for interest from the date he attempted to re-sell the stock to Evans and

for attorneys' fees. Evans appealed from the adverse judgment on the merits. Shaw appealed from the judgment insofar as it denied his request for interest.

Evans' attack on the judgment is three-pronged: first, that the district court erred in holding that the agreement was ambiguous; secondly, that assuming the agreement to be ambiguous, the extrinsic evidence clearly showed that the proper interpretation of the agreement was that advanced by Evans; and, finally, that the district court adopted an entirely erroneous procedure in the submission of the case to the jury. These three contentions will be separately considered.

Upon a consideration of the entire agreement, we conclude that Evans' first contention, i. e., that the language of the agreement unambiguously supports its interpretation, must fail. Indeed, considered alone, the language of the provision for determining price in the event of an election to re-sell (quoted above) might be viewed as unambiguously *contra* to Evans' interpretation. Evans seeks to have us read the word "plus" in that provision as equivalent to "adjusted by adding," even though it has failed to show us a single instance in which that word was given such a meaning. Such a novel interpretation would be wholly unjustified,[5] unless required when

---

4. "Special Issue No. 1: Was it the agreement and understanding between Evans Production Corporation and Don J. Shaw that Evans was to repurchase from Shaw 483 shares in Evans Production Corporation for the book value thereof plus 50¢ per barrel on 483/9667 of the proven oil reserves of Evans Production Corporation, or was such agreement and understanding that Shaw was to receive said book value plus 50¢ per barrel for 100% of the proven oil reserves of Evans Production Corporation?

"Answer: The book value plus 50¢ per barrel on 483/9667 of the proven oil reserves or

"The book value plus 50¢ per barrel for 100% of the proven oil reserves.

"Answer: The book value plus 50¢ per barrel for 100% of the proven oil reserves.

"Special Issue No. 2: Was it the agreement and understanding of the parties that the determination of the amount of oil reserves was to be made as of January 22, 1957 or March 31, 1956?

"Answer: March 31, 1956 or January 22, 1957.

"Answer: January 22, 1957."

5. This conclusion, reached entirely upon the basis of the words used in re-purchase provision, is reinforced when attention is directed to the punctuation of that provision. For, even if Evans succeeded in establishing its contention that "plus" could mean "adjusted by adding," the presence of the comma immediately preceding "plus" would tend to indicate that such was not its meaning in this particular context.

the re-purchase provision is considered in the context of the whole agreement.[6]

In support of its contention that such an interpretation is required, Evans points to two other aspects of the agreement. First, the recital at the outset of the agreement that its purpose was "to enable you [Shaw] to obtain a proprietary interest in the affairs of Evans Production Company" is stressed. Assuming for the moment that this recital is inconsistent with Shaw's interpretation of the agreement, the argument is nevertheless unavailing. For, it ignores the further recital that the stock arrangement was designed "as an incentive for you [Shaw] to work for the best interests of Evans Production Corporation and to assist you in your realization of the results of such efforts." That this second recital is entirely consistent with Shaw's interpretation of the agreement is obvious. Thus, Evans' argument on this point would fail even if the asserted inconsistency with the first recital existed.[7] It is apparent, however, that no such inconsistency does exist. Quite clearly, the agreement was designed to give Shaw a proprietary interest in the company. The essential question is not the nature of Shaw's interest but, rather, the extent of it.

Evans' next contention is that when clause (1) of the agreement (the re-purchase provision) is read in the light of clause (2), it is apparent that the interpretation it urges is correct. Clause (2) recites that Evans has taken out a policy of insurance upon Shaw's life in the amount of $50,000 and binds Evans to re-purchase the stock, if requested to do so by Shaw's executor or administrator, out of "the insurance proceeds and other money if necessary." Evans argues that the use of the words "if necessary" precludes Shaw's interpretation for, under that interpretation, "other money" would inevitably be necessary. We deem it sufficient to say that we find that argument inconclusive.[8] Finally, Evans argues that clause (2) renders Shaw's interpretation incredible for, under that interpretation, Shaw's stock would have been worth approximately $200,000 if he had died the very day he signed the agreement, with the result that Evans would have assumed a $150,000 risk on insurance of only $50,000. Again we find the argument unconvincing. Variations between the value of objects insured and the amount of insurance carried thereon are the rule rather than the exception. This Court certainly cannot measure Shaw's interest by Evans' insurance.[9]

6. We do not view the use of the word "value," instead of the word "sum," in referring to the fifty cents for each barrel of proven oil reserves as of any particular significance. We agree with Evans that "value" was probably chosen because the fifty cents was to be added to a figure already referred to as "book value." But the essential question is when this addition was to take place. And, on this crucial point, the use of the word "value" is unilluminating.

7. This follows from the fact that the two recitals are, for present purposes, at least alternative. Indeed, an argument could be made that since the second recital immediately precedes the re-purchase provision, it is the more important of the two in the interpretation of that provision.

8. We may point out that the argument, as presented, is an overstatement. "Other money" would not *inevitably* be

necessary under either interpretation. The difference is actually only one of probabilities, with there being a stronger probability of need for "other money" under Shaw's interpretation.

9. Cf. In re United States Commission to Appraise Washington Market Co. Property, 1924, 54 App.D.C. 129, 295 F. 950, 954, where the opinion correctly observes:

"The amount of insurance which an owner places upon a given piece of property is little or no index of its value. One may feel impelled to carry a much larger percentage of risk than another. The amount of insurance may depend upon the character of the property insured. The probability of destruction by fire is much greater in a frame building, for example, than in a brick building, and, though the buildings are of equal value, the amount of insurance carried in the one case might be very

■ We conclude, therefore, that the district court was correct in ruling that the agreement did not unambiguously support Evans' interpretation.[10] The admission of extrinsic evidence to aid in the interpretation of the agreement was thus not injurious to Evans.

■ There was a sharp conflict in the evidence presented to support each of the opposing contentions. Evans attempted, for example, to show that Shaw was quite adequately compensated by his salary and, to this end, introduced considerable testimony tending to minimize the importance and value of Shaw's services to the company. Shaw, on the other hand, attempted to show that, considering his salary alone, he was grossly underpaid for services which his witnesses characterized as highly valuable. The verdict of the jury, of course, resolved this controversy in favor of Shaw. We must, therefore, assume that Shaw was an extremely important employee whose services were worth the price called for by his interpretation of the agreement.[11] It is in the light of this now settled fact that the evidence relating to the negoti-

ations which led up to the execution of the agreement here in question must be considered.

No really serious conflict as to the basic facts of the negotiations appears. It is undisputed that Shaw wanted a so-called "¼ carried interest" in the reserves of the company. It is equally undisputed that Evans was reluctant to, and, indeed, finally refused to, give him such an interest. Evans argues that this one fact precludes Shaw's interpretation for that interpretation operates to give Shaw an interest even greater than the ¼ carried interest which he was refused. Here again, however, we are compelled to reject Evans' argument.

The interest contended for here by Shaw is, at most, roughly equal to a ¼ carried interest.[12] And it clearly appears from the testimony of Evans' president himself that the demand for a ¼ carried interest was refused, not because such an interest would give Shaw too great a financial reward, but because Evans' president felt that the interests of the company would be better served if Shaw did not have that *kind* of interest.[13] We therefore conclude that the

much larger than in the other. Hence the mere fact that a building is insured for a certain amount is not necessarily an index of its value."

The fact that Evans' risk here may have been underinsured may reflect no more than its belief that Shaw, a young man whose health, so far as appears, was excellent, would not die in the immediate future.

10. Shaw did not contend that the agreement unambiguously supports his interpretation, so that question is not before this Court.

11. The jury might well have believed that Shaw was almost singlehandedly responsible for the success of an enterprise which netted Evans several millions of dollars and, if so, the conclusion that his services were worth roughly one-half million dollars is certainly not unreasonable.

12. It is not clear, either from the records or the briefs in this case, just exactly what a "¼ carried interest" amounts to. Shaw contends that such an interest

would entitle him to ¼ of all oil produced by the Company. If so, such an interest would be worth approximately seventy cents for each barrel of oil produced since the evidence showed that the market value of oil was $3.00 per barrel at the time of Shaw's election to re-sell. Evans, on the other hand, attempts to relate the so-called "¼ carried interest" to the value of the oil in the ground. Since the evidence shows that, at this stage, the value of the oil was only $1.35, Evans contends that a ¼ carried interest would have been worth only about thirty-four cents per barrel. We find it unnecessary to resolve this conflict in view of the fact that both of these figures are close enough to fifty cents per barrel when considered in the light of the tax consequences of each. See note 13, infra.

13. Thus, T. M. Evans, the company president, testified as follows:
"Q. And you were very definite that you did not want him to have that character of interest? A. It wasn't I didn't want him to have it; but I didn't think

extrinsic evidence adduced did raise a question of fact for the jury and the district court was correct in refusing to grant Evans' motions for a directed verdict and for judgment notwithstanding the verdict.[14]

■ Evans' third and last contention is that the district court submitted the case to the jury under an erroneous procedure. We find this contention wholly without merit. The procedure adopted was that of instructing the jury as to the law governing the case and then submitting to it the ultimate issue as to the proper interpretation of the contract. Such a procedure has long been sanctioned as appropriate where the extrinsic evidence presents a question of fact.[15] Jackson v. King,[16] was reversed, not because of the procedure adopted, but because the instructions given were inadequate. Here, Evans has failed to preserve any objections to the district court's instructions. See Maryland Casualty Co. v. Reid, 5 Cir., 1935, 76 F.2d 30, 33. Without passing upon the adequacy of the instructions given in this case had those instructions been given in the face of proper objection, we hold that they were not so grossly inadequate as to warrant reversal in the absence of such objection.

We conclude, therefore, that the case must be affirmed insofar as Evans' appeal is concerned. There remains only the question of whether the district court should have allowed interest from January 22, 1957, as contended by Shaw in his appeal.

■ Under the law of Texas, which both parties concede to be controlling on this issue, it is well settled that interest is collectible "as a matter of law if the amount of recovery, whether under a contract or for a tort, depends on conditions existing at the due date, though unascertained and disputed till the time of the trial." [17] Since the measure of recovery in this case, i. e., the book value of the stock plus fifty cents per barrel of proven oil reserves, clearly depended on conditions existing on January 22, 1957, the allowance of interest from that date

---

he could operate in the company's best interests if he had an interest different from the Company's. After all, if the Company or I were paying for the drilling, it would be to his advantage to drill a well anywhere, because it wouldn't cost him anything. You might find oil outside of this Courthouse. I wanted to try to avoid that and not get so many dry holes."

In this connection, Shaw also points out the different tax consequences which follow from a "¼ carried interest" and the fifty cents per barrel formula used in the agreement. A "¼ carried interest" would give the owner thereof an interest in the oil itself sufficient to entitle him to the tax depletion allowance, whereas the fifty cents per barrel arrangement actually agreed upon leaves the depletion allowance for the entire value of the oil with Evans.

14. At this juncture, we can dispose of one other, relatively minor, point presented by Evans' appeal. That point involves the question of whether the agreement contemplated the determination of the amount of proven oil reserves as of the date of an election to re-sell, or as of the date of the last annual statement immediately preceding that election. In our view, Evans' position on this point, i. e., that the appropriate date is that of the last annual statement, is inextricably tied to its position on the primary question of interpretation, and its failure there precludes it on this point. The question was submitted to the jury as Special Issue No. 2 and the jury's answer is determinative.

15. See Feldmann v. Connecticut Mutual Life Ins. Co., 5 Cir., 1944, 142 F.2d 628, 634; Vernon v. Union Oil Company of California, 5 Cir., 1959, 270 F.2d 441, 447 at note 9.

16. 5 Cir., 1955, 223 F.2d 714, 718.

17. City of Texarkana, Tex. v. Arkansas Louisiana Gas Co., 5 Cir., 1941, 118 F. 2d 289, 294. This rule, recognized by this Court as the law of Texas at that time, has since been reaffirmed by the Supreme Court of Texas in Texas Company v. State, 1955, 154 Tex. 494, 281 S.W.2d 83.

was mandatory unless the case was removed from the operation of this general rule by the existence of special circumstances.

■ Evans contends that it was so removed. This contention is based on the fact that Shaw's original demand upon Evans to re-purchase the stock was predicated upon the theory that there were 950,000 barrels of proven oil reserves, whereas, in fact, there were only 775,-353 barrels of such reserves at the time. On the basis of this fact, Evans attempts to rely on the decision of the Texas Supreme Court in Ingham v. Harrison,[18] where it was held that where the failure to pay on the due date is due to the fault of the plaintiff in insisting upon unjust claims, interest is not recoverable. In our view, this case is not controlling. For here, the failure to pay cannot, in any proper sense, be attributed to the insistence of Shaw upon unjust claims. He put forth 950,-000 barrels as his good faith estimate of the amount of proven oil reserves. Evans then refused to counter this estimate with an estimate of its own, and contended, rather, that Shaw had misconstrued the agreement. Indeed, the fact that disagreement as to the amount of the proven oil reserves was not the cause of the refusal to pay is clearly shown by the fact that, even though the parties were eventually able to enter a stipulation as to the amount of these reserves, the refusal to pay and this litigation persisted. The exception to the general rule laid down in the Ingham case is thus not available to Evans. There being no other theory upon which the operation of this rule is sought to be avoided, we hold that it must apply. The district court was in error in denying Shaw's request for interest from January 22, 1957. The judgment must be modified to grant that request, and it is so

Modified and affirmed.