James B. ASBERRY and Wife, Nina Asberry, Plaintiffs-Appellants,

v.

SAINT JOSEPH PETROLEUM, DIV. BEAVER ENGINEERING, INC., Defendant-Appellee.

No. 82–241–II.

Court of Appeals of Tennessee, Middle Section, at Nashville.

March 2, 1983.

Permission to Appeal Denied by Supreme Court June 20, 1983.

John E. Appman, Jamestown, Tenn., for plaintiffs-appellants.

Alfred Adams, Jr., and Robert E. Kolarich, Jr., Nashville, Tenn., for defendant-appellee.

## OPINION

CONNER, Judge.

This lease for approximately fifty acres of land with a primary term of six months was executed by the plaintiffs-appellants, James B. Asberry and wife, Nina Asberry (lessors), and the defendant-appellee, Saint Joseph Petroleum (lessee),[1] on February 28, 1979. It was a printed form lease which contained what is commonly known as a "delayed rental" provision. However, that portion was modified to read:

> If no well be completed on said land on or before 6 months from said date, this lease shall terminate as to both parties.

The language relating to the base term stated:

> It is agreed that this lease shall remain in force for a term of ½ years from this date and as long thereafter as oil, gas, casing-head gas, casing-head gasoline, or any of them is produced from said leased premises, or operations for drilling are continued as hereinafter provided, or op-ated.

---

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbrevi-

erations are continued for the injection of water brine and other fluids into subsurface strata. Provided, however, that for injection purposes, this lease shall continue in full force and effect only as to well or wells so used and the ten acres contiguous thereto.

The Asberry lease also contained "unitization or pooling" and "shut-in royalty" clauses. They provide in pertinent part:

*Lessee is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof with other land,* lease or leases in the immediate vicinity thereof, when in lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said premises in compliance with the spacing rules of any lawful authority, or when to do so would, in the judgment of the lessee, promote the conservation of the oil and gas in and under and that may be produced from premises. In connection with the production of oil such pooling may be in a unit or units not exceeding 50 acres each. In connection with the production of gas such pooling may be in a unit or units not exceeding 320 acres each. Lessee shall execute in writing an instrument identifying and describing the pooled acreage. *The entire acreage so pooled into a tract or unit shall be treated, for all purposes except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated, as if production is had from this lease, whether the well or wells be located on the premises covered by this lease or not.* In lieu of the royalties elsewhere herein specified, lessor shall receive on production from a unit so pooled only such portion of the royalties stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein bears to the total acreage so pooled in the particular unit involved provided, lessee shall be under no obligation whatsoever, express or implied, to drill more than one well to each such unitized tract, regardless of when, where or by whom offset wells may be drilled.

. . . . .

In the event gas is discovered on the leased premises, it is agreed that during any period when, after the discovery of gas on the leased premises, gas is not being sold on account of lack of market, and if there is no apparent production or operation on said lands sufficient to keep this agreement in full force and effect, the LESSEE may pay as royalty Fifty Dollars ($50.00) per year for each shut-in gas well, and such payment will be considered as if gas is actually being produced within the terms and conditions of this oil and gas lease. . . . (Emphasis supplied.)

On April 15, 1979, the defendant lessee commenced drilling operations on the "Bow" property adjacent to the land which is the subject of this lease and approximately 170 feet from the plaintiff's property line. On April 27, 1979, the well referred to as Bow-Asberry # 1 was completed at a depth of 1,320 feet.

The Bow-Asberry well is located in what is known in the industry as the "Stockton Field." This area contains two formations; the Monteagle formation at a depth of 800–900 feet, and the Fort Payne formation at a depth of 1,350–1,400 feet. The best prospect for finding oil in the Stockton Field is at the deeper Fort Payne formation.

Rules and regulations of the Tennessee Oil and Gas Board require that tracts upon which drilling is done contain various acreages depending on the well depth. The depth of the well also determines the distance that the well must be from an adjacent property line. In order to drill for oil in the Fort Payne formation, there must be twenty acre spacing between wells, 934 feet from each well and 467 feet from the adjoining property line unless the property upon which the well is located is "unitized" with another tract. A well drilled on the property leased by the defendant from the plaintiff to the Fort Payne formation below 1,000 feet would by necessity unitize the adjoining tract. However, it could have

been drilled on the Asberry property instead of the Bow premises.

After the Bow-Asberry well was completed to a total depth it was found to have potential as a gas well. Oil was not found in commercial quantities. The well was capped to await completion of construction of a pipeline to the Stockton Field scheduled for the fall of 1982, this being the only feasible way of marketing natural gas.

The lessee then attempted to "pool or unitize" a portion of the plaintiffs' property with the Bow property upon which the well was drilled. The lessee contended the "pooled" well was completed within six months from the execution of the lease under that provision thereof. Monthly payments were submitted by the defendant to the plaintiff pursuant to the shut-in royalty clause.

However, Mr. and Mrs. Asberry refused to accept the proffered payments, contending that the lease had been terminated according to its terms because Saint Joseph Petroleum had failed to complete a well within six months. On July 23, 1981, they filed suit seeking a judicial determination to this effect.

Following the denial of Mr. and Mrs. Asberry's motion for summary judgment the case was tried non-jury. The chancellor held that defendant was entitled to maintain the lease in effect under the "pooling" and "shut-in" gas clauses thereof. Plaintiffs appeal, still asserting that the requirement of completion of a well on the property within six months is controlling.

■ Is the lease in question ambiguous? For if so the document must be construed against the draftsman, here the defendant. *Hanover Insurance Company v. Haney,* 221 Tenn. 148, 425 S.W.2d 590 (1968); *Associated Press v. WGNS, Incorporated,* 48 Tenn. App. 407, 348 S.W.2d 507 (1961); *see also* 17A C.J.S. *Contracts* § 324 p. 217 (1963). Further, if the provisions are in conflict, the added language varying from the printed form must control.

> In the making of oil and gas leases, printed forms are ordinarily used. The printed form is sometimes modified by written provisions. Where there is conflict or incongruity between the written and printed parts of a lease, the intent of the parties, as expressed in the written part, prevails. . . .

2 W. Summers, *Oil and Gas* § 375 p. 506 (1959).

However, we must make every effort to construe all of the provisions, both printed and written, consistently. *Ibid.*

We believe that the above-quoted clauses can be read consistently and that the chancellor's decision was correct. If the "pooling" or "unitization" provision is given effect according to its express wording a well was indeed "completed on said land" [being the combined tracts after unitization] within the required six-month period. This construction is not only reasonable in our view, but also is consistent with the general law of oil and gas.

Where a part of a leased tract is included within a pooled or unitized area, a majority of jurisdictions have held that drilling or production within the unitized area during the primary term of the lease, which prevents the termination of the lease at the end of the primary term, prevents its termination as to the portion of the lease excluded from the unitized area as well as to that portion included. 2 W. Summers, *Oil and Gas,* § 302.1, pgs. 293–94 (1959) and cases cited therein. This is, of course, consistent with the express language of the provision:

> . . . The entire acreage so pooled into a tract or unit shall be treated, for all purposes except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated, as if production is had from this lease, whether the well or wells be located on the premises covered by this lease or not.

In *Mize v. Exxon Corporation,* 640 F.2d 637 (5th Cir.1981), the lease provided that:

> . . . Any operations conducted on any part of . . . unitized land shall be considered . . . operations conducted under this lease.

*Id.* at 639. No well was drilled on the leased property but it was included in the unitized area. Less than one acre of the leased property was included in the oil productive area. The court held that the lease was extended beyond its primary term saying:

A plethora of cases have firmly established the doctrine that operations conducted on any part of unitized acreage, even though not on the land under the lease in question, fulfill the indivisible obligation of the lessee and hold the entire lease beyond the primary term. *This result has been affirmed whether the leased tract lies entirely within the unit,* Whitaker v. Texaco, Inc., 283 F.2d 169 (10th Cir.1960); *Boutte v. Chevron Oil Company,* 316 F.Supp. 524 (E.D.La.1970), aff'd, 442 F.2d 1337 (5th Cir.1971); *Harper v. Hudson Gas & Oil Corporation,* 189 F.Supp. 781 (W.D.La.1960), aff'd, 299 F.2d 238 (5th Cir.1962); *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684 (1959), *or only partially within the unit,* Scott v. Pure Oil Co., 194 F.2d 393 (5th Cir.1952); *Broussard v. Amerada Petroleum Corporation,* 350 F.Supp. 104 (W.D. La.1972); *Gray v. Cameron,* 218 Ark. 142, 234 S.W.2d 769 (1950); *Somers v. Harris Trust & Savings Bank,* 1 Kan.App. 397, 566 P.2d 775 (1977). (Emphasis supplied.)

*Id.* at 640.

Here, a well was selected on the Bow property adjacent to the Asberry property and within 173 feet of the Asberry line. Drilling began in April, 1979, within the primary term, and was completed in the same month. A portion of the Asberry property consisting of 294 feet at the northeast corner was unitized into the well. The Asberry property was credited with 31.5% of any production of the Fort Payne formation or the Monteagle formation. The well location plat designates that portion of the Asberry property which was unitized as required by the subject provision.

■ Thus, we believe the lease was extended by the unitization provision and the defendant's drilling operation which unitized a portion of the subject property. This being the case, the payments tendered by the defendant under the shut-in royalty clause extend the lease by its express terms.

■ The shut-in royalty clause, common to most oil and gas leases, expressly qualifies the rule of construction that a lease terminates at the end of the primary term unless there is production. It permits a lessee who has discovered gas in paying quantities during the primary term for which there is no market to keep the lease alive by the payment of a fixed money royalty. Where the well is shut-in for lack of market and the lessee fails to pay or tender the shut-in royalty as provided for in the lease, the lease terminates at the end of the primary term. On the other hand, if the royalty is paid or tendered the lease does not so terminate. 2 W. Summers, *Oil and Gas,* § 299, pgs. 226–27 (1959).

In *Vernon v. Union Oil Company of California,* 270 F.2d 441 (5th Cir.1959), the lease contained a constructive production provision similar to the present case:

* * * where gas from a well producing gas only is not sold or used, Lessee may pay as royalty $50.00 per well per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph 2 hereof * * *.

*Id.* at 442. The court determined that the lessee perfected constructive production by tender of the specified royalty payments thereby extending the lease upon the following rationale:

. . . The reason that this kind of a provision has come into growing use during the last twenty-five years goes back to the inherent physical nature of natural gas. Unlike oil, it cannot be produced and stored or transported in railroad cars or tank trucks. A lessee completing a gas well consequently often had a special and quite onerous problem in finding a market outlet for his gas production. This would, at times, result in losing a lease at the end of the primary term and the dissipation of all prospect for profit

from the lessee's development investment. . . .

*Id.* at 446.

This court addressed the effect of a "shut-in royalty" provision in *Neubert v. Messer,* 15 Tenn.App. 210 (1932) and quoted with approval from *Morris v. Messer,* 156 Tenn. 54, 299 S.W. 782 (1927):

> . . . Under the clearly expressed terms of the lease, if the lessee does not drill he may still continue the lease in force by payment of the stipulated rental. Such matter being covered by the express terms of the written contract, no implication can arise in relation thereto, inconsistent with, or in opposition to, such plain provision of the written contract. . . .

*Id.* at 216; *see also Archer County v. Webb,* 326 S.W.2d 250 (Tex.Civ.App.1959); *Union Oil Company of California v. Ogden,* 278 S.W.2d 246 (Tex.Civ.App.1955); *Morriss v. First National Bank of Mission,* 249 S.W.2d 269 (Tex.Civ.App.1952); *Carlisle v. United Producing Company,* 278 F.2d 893 (10th Cir. 1960).

Here Saint Joseph Petroleum tested the well which was completed within the primary term. The results indicated that it was potentially productive of gas. However, there was no market for gas from the well because no pipeline had been constructed into this field. The well was shut-in and royalty payments of $50.00 were tendered to the Asberry's as provided in the lease.

In the recent Tennessee decision of *Waddle v. Lucky Strike Oil Company, Inc.,* 551 S.W.2d 323 (Tenn.1977), the parties executed an oil and gas lease for a primary term of ten years. The lessee was to begin drilling operations within six months or pay $75.00 annually for deferring drilling. In the event of a dry hole or cessation of drilling operations the lease continued provided operations commenced or the lessee paid $75.00 per annum prior to the next rental date. The lessee commenced drilling within six months but the well was subsequently red-tagged by the state. The lessee did not pay the delay-rentals or resume drilling. The court held that the lease expired by its own terms:

> We conclude that this lease required lessee to drill, *to pay delay rental,* or to be in production in paying quantities on the "rental paying date[s]," . . . (Emphasis supplied.)

*Id.* at 327.

In the present case Saint Joseph completed a well within six months from the date of execution [giving effect to the pooling provision], paid the shut-in royalty payments [delay rental] required by the lease to extend the duration and continued its efforts to develop and market the gas. Thus, the lease is extended by its own terms. This is precisely what the court in *Waddle, supra,* deemed necessary to extend the lease, but found lacking.

Even though there was typed into the printed portion of the lease a requirement that a well must be completed within six months or that the lease would terminate, we think this language can be read consistently with the pooling and shut-in royalty clauses so as to allow the lessee the right to invoke these latter provisions. It must be remembered that neither was struck from the form lease in any way by the parties. To find for the plaintiffs that is precisely what we would have to do by judicial fiat. We cannot rewrite the contract for the Asberrys and Saint Joseph Petroleum.

Accordingly, this cause is affirmed and remanded. The costs are taxed against Mr. and Mrs. Asberry.

AFFIRMED AND REMANDED.

TODD, P.J. (M.S.) and LEWIS, J., concur.