**CALI–KEN PETROLEUM CO., INC.,**
Plaintiff/Appellee,

v.

**Melvin SLAVEN, Shirley Slaven, Elzadie Slaven, Ridley Slaven, and Louthie Smith, Defendants/Appellants.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Feb. 3, 1988.

Permission to Appeal Denied by Supreme Court June 27, 1988.

John E. Appman, Jamestown, for defendants/appellants.

R. Bruce Ray, Jamestown, for plaintiff/appellee.

KOCH, Judge.

## OPINION

This appeal involves the interpretation of an oil and gas lease. After the lessors insisted that the lease had terminated for failure to tender timely shut-in royalty payments, the assignee of the lease brought suit in the Chancery Court for Fentress County seeking to gain entry to the leased property and for a declaration concerning the continuing validity of the lease. The trial court, sitting without a jury, held that the lease was still in effect. The lessors have appealed. We concur with the trial court's construction of the lease and, therefore, affirm the judgment.

### I.

The facts in this case are largely undisputed. Melvin Slaven and his brothers and sisters, Shirley Slaven, Elzadie Slaven, Ridley Slaven, and Louthie Smith entered into an oil and gas lease with Rebel Oil Corporation ("Rebel Oil") on December 5, 1983. They used one of Rebel Oil's preprinted, standard lease forms that was designed to be used for a term of years. However, they amended the habendum clause to provide for a primary term of six months without making corresponding modifications to the other provisions of the lease.[1]

Rebel Oil began drilling on January 16, 1984 and discovered natural gas and a

---

1. Paragraph two of the lease provides:

It is agreed that this lease shall remain in force for a primary term of 6 months as long thereafter as any crudes are produced from said leased premises or operations for drilling are continued as hereinafter provided, or operations are continued for secondary or tertiary recovery of any crudes.

small amount of oil. The well was completed on January 27, 1984. Shortly thereafter, Rebel Oil began operations that were intended to make the well a producing oil well. An electric log was run on February 4, 1984. A cable rig was moved onto the well ten days later, and the well was bailed. The cable rig was removed on February 27, 1984, and operations ceased for approximately three months.

On June 1, 1984, Rebel Oil ran 1,284 feet of production casing into the well and cemented the casing in. It perforated the well on June 6, 1984 and pumped two thousand gallons of 20% hydrochloric acid into the well. The well was swabbed on June 13, 1984, and an additional 3,900 gallons of acid were pumped into the well two days later. The well was then swabbed for two or three days, left for thirty days, and then swabbed again. It was "sand fracked" at the end of July or the beginning of August, 1984. Rebel Oil installed a pump on the well a few days after completion of the sand fracking. The pump did not work properly and was replaced at the end of August or the beginning of September, 1984.

On September 25, 1984, Rebel Oil assigned one hundred percent of its working interest in the well to Cali–Ken Petroleum Co., Inc. ("Cali–Ken"). Cali–Ken bailed the well on October 31 and November 1, 1984. Then it reperforated the well and pumped in another two thousand gallons of hydrochloric acid. The well was swabbed every day for a week, and then the pump was replaced again.

The well produced less than a barrel of oil per week. On January 21, 1985, Cali–Ken capped the well and shut in the natural gas because there was no market for the gas at the time. At this point, Cali–Ken had spent in excess of $49,000 in reworking the well.

On May 15, 1985, Cali–Ken notified Melvin Slaven that it intended to reopen the well in anticipation of the construction of a gas gathering and transportation pipeline nearby. On August 16, 1985, Cali–Ken tendered a check for $98.50 to the lessors for the shut-in royalty as required by the lease.

The lessors refused to accept the check on the ground that the lease had terminated at the end of its initial term.

The Chancery Court found that the lease was kept in force following the primary term because Cali–Ken reworked and operated the well until January 21, 1985 when the well was capped. The court further held that January 21, 1985 became the "trigger date" from which Cali–Ken had one year to tender the shut-in royalty payment. Accordingly, the trial court found that the tender of the shut-in royalty payment on August 16, 1985 was effective to keep the lease in force.

## II.

This dispute stems from the parties' conflicting interpretations of the lease's shut-in royalty clause. It is due, in large measure, to their shortening the initial term of the lease without making corresponding changes to the remaining portions of the lease. One authoritative text has noted that this is, unfortunately, a common problem in the oil and gas industry. *See* 3 H. Williams, *Oil and Gas Law* § 604.8 (1986).

Like any other contract, an oil and gas lease should be interpreted using the commonly accepted rules of construction. It should be considered in its entirety. *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985); *Aetna Cas. & Sur. Co. v. Woods*, 565 S.W.2d 861, 864 (Tenn.1978). Unless its language is ambiguous, it must also be construed according to its plain terms. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn.1975); *Bokor v. Holder*, 722 S.W.2d 676, 679 (Tenn.Ct.App.1986). Notwithstanding sloppy drafting, we have determined that the resolution of the parties' dispute can be found within the four corners of the lease itself.

The lessors' primary contention is that the lease terminated because timely shut-in royalty payments were not made. Relying on paragraph two and the shut-in royalty

provision in paragraph four[2], they insist that the time for making the shut-in royalty payments began to run in January, 1984 when the natural gas was first discovered. Paragraph four of the lease requires the shut-in royalty to be tendered "annually at the end of each yearly period during which such gas is not sold or used". Thus, the lessors argue that the shut-in royalty should have been tendered by January, 1985 and that the tender on August 16, 1985 came too late.

We do not agree with this contention. Both oil and gas were discovered in January, 1984 when the well was first drilled. Operations to make the well a producing oil well were undertaken and continued diligently until the well was capped on January 21, 1985. Accordingly, like the trial court, we find that the time within which the shut-in royalty payment should have been made did not begin to run until January 21, 1985.

One of the purposes of an oil and gas lease is to encourage the diligent operation of the well. *See Waddle v. Lucky Strike Oil Co.*, 551 S.W.2d 323, 326–27 (Tenn. 1977); *Young v. Dixie Oil Co.*, 647 S.W.2d 235, 237 (Tenn.Ct.App.1982). Thus, oil and gas leases generally provide that the lease terminates at the end of its primary term unless there is production. Shut-in provisions, such as the one contained in paragraph four, provide relief from the diligent operation requirement by permitting lessees who have discovered gas in paying quantities to keep the lease alive by paying a fixed money royalty even though the gas is not being produced. *See Asberry v. Saint Joseph Petroleum*, 653 S.W.2d 412, 416 (Tenn.Ct.App.1983).

The shut-in royalty clause in paragraph four must be considered in light of the remainder of the lease. Paragraph nine permits the initial term of the lease to be extended if, at the end of the initial term, the lessee is drilling or reworking the well and does not cease doing so for any period longer than sixty days.[3]

Reworking operations consist of "[w]ork performed on a well after its completion, in an effort to secure production where there has been none, restore production that has ceased, or increase production". 8 H. Williams & C. Meyers, *Oil and Gas Law Manual of Terms* 758 (1986). *See also Rogers v. Osborn*, 152 Tex. 540, 261 S.W.2d 311, 313–14 (1953). They include testing, evaluation, and all acts necessary to reworking a given well. *Lone Star Producing Co. v. Walker*, 257 So.2d 496, 500 (Miss.1971). *See also Harry Bourg Corp. v. Union Producing Co.*, 197 So.2d 172 *passim* (La.App.1967).

■ The primary term of the lease was six months. Thus, the earliest possible expiration date of the primary term was June 6, 1984. Beginning on June 1, 1984 and continuing without cessation until the well was capped on January 21, 1985, first Rebel Oil and then Cali–Ken ran production casing into the well and perforated, acidized, swabbed, and sand fracked. There is little question that Rebel Oil was engaged in reworking operations when the primary term of the lease expired and that the operations continued without ceasing for more than sixty days until the well was finally capped.

Cali–Ken ceased it efforts to induce the production of oil from the well only after it became apparent that its efforts would not

---

2. The shut-in royalty provision states:

The lessee shall pay lessor as royalty ⅛ of the proceeds from the sale of gas as such at the mouth of the well where gas only is found and where such gas is not sold or used, lessee shall pay or tender annually at the end of each yearly period during which such gas is not sold or used, as royalty, an amount equal to the delay rental provided in paragraph 5 hereof, and while said royalty is so paid or tendered this lease shall be held as a producing lease under paragraph 2 hereof.

The delay rental fee, as set by paragraph five of the lease, is $1.00 per acre per annum.

3. Paragraph nine provides, in part:

If at the expiration of the primary term oil or gas is not being produced on said land but lessee is then engaged in drilling or reworking operations thereon, this lease shall remain in force so long as operations are prosecuted with no cessation of more than sixty days, and if they result in production of oil or gas so long thereafter as oil or gas is produced from said land.

be successful. In accordance with paragraph nine of the lease, the term of the lease was extended until January 21, 1985 when the well was capped. Thus, the "yearly period" within which paragraph four required the royalty to be tendered began to run on January 21, 1985, when the gas was shut in. Since Cali–Ken's shut-in royalty payment was tendered on August 16, 1985, it was timely and had the effect of extending the lease.

As an alternative theory, the lessors insist that the lease terminated at the expiration of the primary term because no work was done on the well from February 27 to June 1, 1984. Since this period exceeded sixty days, they insist that the lease could not be extended pursuant to paragraph nine. This contention is also erroneous.

Paragraph nine's requirement that operations taking place after the expiration of the primary term of the lease cannot cease for more than sixty days at a time applies only to operations taking place after the end of the primary term. The break in operations on which the lessors rely occurred before the end of the primary term of the lease. Therefore, it is not relevant to the operation of paragraph nine.

### III.

The judgment of the trial court is affirmed, and the case is remanded for whatever further proceedings may be necessary. The costs of this appeal are taxed jointly against Melvin Slaven, Shirley Slaven, Elzadie Slaven, Ridley Slaven, and Louthie Smith and their surety for which execution, if necessary, may issue.

LEWIS and CANTRELL, JJ., concur.