**J. A. HARPER**

v.

**HUDSON GAS & OIL CORPORATION.**

**Civ. A. No. 7600.**

United States District Court
W. D. Louisiana,
Monroe Division.
Dec. 9, 1960.

782

James D. Sparks, Thompson, Thompson & Sparks, Monroe, La., for plaintiff.

Patrick W. Looney, Bodenheimer, Looney & Richie, Shreveport, La., for defendant.

BEN C. DAWKINS, Jr., Chief Judge.

In this action, brought originally in the State Court, and timely removed here under authority of 28 U.S.C. § 1441(a),[1]

1. "*Actions removable generally*
 "(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be re-

plaintiff, a citizen of Louisiana, seeks a judgment against defendant, a corporate citizen of Texas, declaring that he is the lawful owner of an oil and gas lease covering certain lands in Franklin Parish, Louisiana, and that his lease is superior to similar leases claimed to be held by defendant, affecting the same lands.

For a clear understanding of the issues presented, the facts must be set forth in chronological order.

On April 4, 1945, C. A. Anderson, Lillie Mae Anderson Cupit, Hiram Anderson and Willie Anderson, the owners of the SW ¼ of the SE ¼ of Section 33, Township 16 North, Range 9 East, executed an oil, gas and mineral lease, for a primary term of ten years, in favor of O. G. Collins, covering the property. The lease was assigned by Collins to defendant on February 18, 1955.

On March 9, 1955, an agreement was executed between the lessors and defendant extending the lease for an additional 60 days from April 4, 1955. Drilling was begun by defendant on May 29, 1955, but the well, C. A. Anderson No. 1, resulted in a dry hole, and was plugged and abandoned on June 6, 1955, as evidenced by the official records of the Louisiana Department of Conservation.

Meanwhile, pursuant to an application for field rules governing the production of oil and gas, filed by defendant with the Commissioner of Conservation on April 25, 1955, a public hearing was held on June 22, 1955. Plaintiff was given notice of this hearing, and, according to the official transcript, was present at it. Defendant then requested that 7.58 acres, lying in the S ½ of SW ¼ of SE ¼ of Section 33, Township 16 North, Range 9 East, be included in a drilling unit with an adjacent quarter-quarter section lying immediately to the south, being the NW ¼ of the NE ¼ of Section 4, Township 15 North, Range 9 East. This 7.58 acre tract was proven, by information obtained while drilling the C.

A. Anderson No. 1 well, to be the only productive acreage in the SW ¼ of SE ¼, Section 33, Township 16 North, Range 9 East; and it could be effectively drained by the J. T. O'Brien No. 2 well, owned by defendant, located on the NW ¼ of NE ¼, Section 4, Township 15 North, Range 9 East. The Commissioner took this application under advisement; and on July 8, 1955, he issued Order No. 311, establishing the drilling unit as requested, comprising 46.58 acres, effective that date. Prior to, and on the effective date of the Order, the O'Brien No. 2 well was producing oil in paying quantities, and has continued to do so since.

It should be noted that the effective date of the unitization order was 34 days after June 4, 1955, the expiration of the primary term of the first lease under attack, and 32 days after the C. A. Anderson No. 1 well was plugged and abandoned as a dry hole; that the J. T. O'Brien No. 2 well was producing oil on the effective date of the Order; and that the producing well was located on a unit which included part of the property covered by defendant's lease but was not on that particular land. These facts are important to the contentions made by plaintiff which will be examined in detail, *infra*.

Plaintiff acquired the lease under which he claims a proportionate share of production from the producing unit in the following manner:

(1) On June 23, 1955 (one day after the Conservation Commissioner's hearing), recorded June 25, 1955, C. A. Anderson sold to Robert L. Fuller ½ of the oil, gas and minerals in and under the SE ¼ of SW¼ of SE ¼ of Section 33, Township 16 North, Range 9 East.

(2) On June 25, 1955 (three days after the Commissioner's hearing), recorded on June 27, 1955, Lila Mae Anderson Cupit sold to V. A. Randall all of her interest (being a ⅙th mineral interest)

moved by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

in and to the oil, gas and other minerals produced from the SE ¼ of SW ¼ of SE ¼, Section 33, Township 16 North, Range 9 East.

(3) On the same day, June 25, recorded June 27, 1955, C. A. Anderson sold to V. A. Randall all of his interest in and to the oil, gas and minerals produced from the SW ¼ of SW ¼ of SE ¼, Section 33, Township 16 North, Range 9 East.

(4) On the same day, June 25, 1955, Randall sold to Robert L. Fuller all of his interest in the oil, gas and other minerals he had acquired from Lila Cupit earlier that day, as set forth in (2) above.

(5) On the same day, June 25, 1955, Randall sold to Fuller all of his interest in and to the oil, gas and other minerals he had acquired from C. A. Anderson, as set forth in (3) above.

As a result, Robert L. Fuller, on June 25, 1955, owned the following mineral interests:

(1) ½ of all the minerals in and under the SE ¼ of SW ¼ of SE ¼, Section 33, Township 16 North, Range 9 East;

(2) ¼₆ of all the minerals in and under the SE ¼ of SW ¼ of SE ¼, Section 33, Township 16 North, Range 9 East;

(3) ½ of all the minerals in and under the SW ¼ of SW ¼ of SE ¼, Section 33, Township 16 North, Range 9 East.

J. A. Harper, plaintiff herein, obtained an oil, gas and mineral lease covering these mineral interests from Robert L. Fuller on August 1, 1955, recorded August 15, 1955.

In addition to the lease of April 4, 1945, assigned to Hudson, a second lease was executed on June 20, 1955, by C. A. Anderson and Lila Mae Anderson Cupit in favor of H. A. Harper, covering the SW ¼ of SE ¼, Section 33, Township 16 North, Range 9 East. H. A. Harper assigned this lease to Hudson Oil on June 24, 1955. This lease was not recorded until June 29, 1955, two days after the recordation of the mineral sales by Anderson and Lila Cupit to Fuller and Randall.

Plaintiff alleges that he has made amicable demand on defendant to deliver to him his proportionate share of production from the J. T. O'Brien No. 2 well. As lessee of the mineral interests outlined above, plaintiff alleges that he is entitled to the following proportion of production:

1. 7/8 of 1/2 of 5.69/46.48
2. 7/8 of 1/16 of 5.69/46.48
3. 7/8 of 1/2 of 1.89/46.48.

Hudson having refused to deliver to him the proportionate share of production he claims, plaintiff alleges that defendant has violated LSA–R.S. 30:105 and has damaged him in the sum of $10,-000. Plaintiff also prays for $2,500 in attorney's fees.

In order to succeed in his action, plaintiff must show that the lease of April 4, 1945, held by defendant, is no longer valid, and that his lease of August 1, 1955, is superior to the lease executed in favor of defendant on June 20, 1955. If the original lease withstands the legal assaults made upon it by plaintiff, it will not be necessary to consider the validity of the second lease. Accordingly, we first will examine the provisions of the lease and the arguments made by plaintiff that it is no longer in full force and effect.

The oil, gas and mineral lease was executed on April 4, 1945. It is on a standard printed form, Bath Louisiana Special 14–BR 1. The habendum clause (Paragraph 2) reads: "Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called 'primary term') and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder." The lease requires the lessee to commence drilling operations within one year and provides for the payment of delay rentals for the privilege of deferring the commencement of such operations for one year and each succeeding

year during the primary term upon payment of a like sum.

Two paragraphs are particularly important in this case, and must be quoted in detail:

"5. If prior to discovery of oil, gas, sulphur or other mineral on said land, lessee should drill a dry hole or holes, thereon, or if after discovery of oil, gas, sulphur or other mineral, the production thereof should cease from any cause, this lease shall not terminate if lessee commences operations for additional drilling or reworking within sixty days thereafter or (if it be within the primary term) commences additional drilling operations or commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole or cessation of production. If during the last year of the primary term and prior to the discovery of oil, gas, sulphur or other minerals on said land lessee should drill a dry hole thereon, no rental payment or operations are necessary in order to keep the lease in force during the remainder of the primary term. If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but lessee is then engaged in drilling or reworking operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land. * * *

"6. If at any time while this lease is in force and effect lessee in its opinion deems it advisable and expedient, in order to form a drilling unit or units to conform to regular or special spacing rules issued by the Commissioner of Conservation of the State of Louisiana, or by any other State or Federal authority having control of such matters, or in order to conform to conditions imposed upon the issuance of drilling permits, lessee shall have the right, at its option, to pool or combine the lands covered by this lease, or any portion or part thereof, with other land, lease or leases in the immediate vicinity thereof, whether such land, lease or leases are held by lessee or by others, such pooling to be into a unit or units not exceeding the number of acres, or the land subdivision, whichever may be the larger, allocated to one well by the above mentioned authority or authorities, and to be applicable only to such sands, horizons or strata as are covered by such regulations. * * * As between the parties hereto and except as herein otherwise specifically provided, the entire acreage so pooled into a tract or unit shall be treated for all purposes as if it were included in this lease. In lieu of the royalties elsewhere herein specified, lessor shall receive, on the production from the unit so pooled, only such proportion of the royalties stipulated herein as the amount of his acreage (mineral rights) placed in the unit bears to the total acreage so pooled in the particular unit involved. Drilling operations on or production of oil, gas, sulphur or other minerals from any portion of the land covered hereby shall continue this lease in force and effect during or after the primary term as to all of the lands covered hereby, irrespective of whether any portion thereof has been pooled. If operations be conducted on or production be secured from land in such pooled unit other than land covered by this lease, it shall have the same effect as to maintaining lessee's rights in force hereunder as if such operations were on or such production from land covered hereby, except that its effect shall be limited to the

786

land covered hereby which is included in such pooled unit. * * *"

The extension agreement, executed on March 9, 1955, provides that the lease shall be extended for

"a period of sixty (60) days from April 4, 1955, and so long thereafter as oil, gas or other mineral is produced from said land.";

further, that

"In all other [r]espects, except as expressly changed hereby, the original lease shall continue in full force and effect as originally written. And for the same consideration hereinabove recited, the undersigned Lessors do hereby in all things adopt, ratify and confirm said lease as same is hereby amended and extended, and do hereby lease, demise and let all of the hereinabove described acreage covered by said lease unto said Hudson Gas & Oil Corporation, Lessee, subject to, in accordance with and under the terms and provisions of said lease as same is hereby amended and extended."

Plaintiff has moved for a summary judgment. Both parties agree that there is no real issue of material fact; hence we will decide the case accordingly.

Plaintiff argues that the lease could be maintained beyond its primary term, June 4, 1955, only by obtaining production from the leased premises, or by conducting continual drilling operations on the property. He concedes that the lease could have been extended beyond the primary term by the lessee commencing "operations for additional drilling or re-working operations within sixty days" after the dry hole was completed on June 6, 1955. However, he argues that the application to form a pooled unit by attaching a portion of the leased premises to a producing well in another section, and its actual attachment by official order of the Conservation Commissioner,

do not constitute such "additional drilling or re-working operations."

Plaintiff also contends that under the extension agreement the lessee did not have the right to pool any portion of the leased premises with other land. Pointing to the habendum clause in the extension agreement, plaintiff argues that the phrase "or land with which said land is pooled hereunder," found in the habendum clause of the original lease agreement, has been significantly deleted. As a result, he contends that defendant did not have the right to pool the leased property with the J. T. O'Brien No. 2 well in order to maintain the lease. However, plaintiff contends that if defendant did have such a right, the pooling must have been done during the primary term of the lease and prior to obtaining production from the unit so established.

Two basic questions thus are presented for our consideration: (1) Whether the lease was continued in force and effect beyond the end of the primary term for a period of sixty days; and (2) if so, whether the establishment by the Commissioner of Conservation of a drilling unit within that 60-day period, including a portion of the leased premises with a producing well located on another section of land, maintained the lease thereafter.

After examining in detail the Louisiana jurisprudence and considering the well-written briefs of opposing counsel, we are convinced that both questions must be answered affirmatively.

■■ The first issue presented turns on an examination of Paragraph 5 of the lease agreement. There is a lack of Louisiana jurisprudence to aid us in interpreting this provision, and, in the absence of such precedent, we must attempt to reach the same result as the Courts of the State would reach had the matter been presented to such Courts originally.[2] We also are guided by the

2. Jackson v. Flohr, 9 Cir., 227 F.2d 607, certiorari denied 350 U.S. 947, 76 S.Ct. 322, 100 L.Ed. 826; Big State Barg-

ing Co. v. Calmes, D.C., 138 F.Supp. 891; Mayronne Mud & Chemical Co. v. T–W Drilling Co., D.C., 168 F.Supp. 800.

well-settled principle of Louisiana law that oil and gas leases must be construed to give effect to all of their provisions so far as possible.[3]

In Stanolind Oil & Gas Co. v. Newman Brothers Drilling Co., 157 Tex. 489, 305 S.W.2d 169, the Supreme Court of Texas interpreted a lease provision identical to Paragraph 5, here under consideration. The thirty-day clause applied, the Court said, when the lease has been kept in force for the full primary term, and there is no production but the lessee is engaged in drilling or reworking operations at the end of such term. The thirty-day clause will keep the lease in force as long as that *particular* drilling or reworking operation is prosecuted without cessation of more than thirty days until that operation is completed to production or a dry hole. If a dry hole results from that drilling operation which was begun during the primary term of the lease, the sixty-day clause became applicable since the thirty-day clause did not provide that in such a case the lease would be maintained *only* by the diligent prosecution of that particular operation.

Examining the sixty-day clause, the Court stated [157 Tex. 489, 305 S.W.2d 174]:

"The sixty-day clause deals only with two fact situations: (1) where a dry hole or holes are drilled prior to the discovery of oil or gas, and (2) where after discovery of oil or gas production ceases from any cause. The sentence provides that in either of the two fact situations, the lease may be kept in force by *additional* drilling or reworking operations begun within sixty days or (if it be within the primary term) by resumption of payment of delay rentals within a stipulated time. The lessee is specifically given the right to keep the lease alive by resuming payment of rentals in either

situation provided it occurs before the end of the primary term. By necessary implication the lease may be kept in force by the additional drilling or reworking operations in either fact situation whether occurring within or after the end of the primary term.

"Although the clause stipulates that the lease will not terminate, it was not included simply to insure that the drilling of a dry hole or cessation of production would not be grounds for forfeiture of the lessee's estate. If this were its only purpose, it could be effective only at a time when the lease is, and would otherwise remain, in full force and effect under its other provisions, i.e. during the primary term. The parenthetical expression shows beyond any question that the parties contemplated that the provision would be effective both during and after such term. Its primary purpose is to give a lessee who has incurred the expense of drilling a well an opportunity to save his lease in the event the well is a dry hole or production ceases after having been obtained. The effect of the provision then, once it becomes operative and lessee begins additional operations within the stipulated time, is to keep the lease alive as long as the additional drilling or reworking operations, and any production resulting therefrom, continue.

"There is nothing in the lease to suggest that the sixty-day clause will not be effective if the particular operation begun during the primary term results in a dry hole. Even though the dry hole results from drilling which was going on at the end of the primary term, or there is a cessation of production which kept the lease alive after the end of such term, the parties have agreed that

3. LSA–C.C. Arts. 1945–1962; Lozes v. Segura Sugar Co., 52 La.Ann. 1844, 28 So. 249; Glassell v. Richardson Oil Co., 150 La. 999, 91 So. 431; Gautreaux v. Harang, 190 La. 1060, 183 So. 349; Knight v. Blackwell Oil & Gas Co., 197 La. 237, 1 So.2d 89.

the lease may be kept in force by *additional* drilling or reworking operations begun within sixty days, but *only* in the two fact situations mentioned. * * *." See also, to the same general effect, St. Louis Royalty Co. v. Continental Oil Co., 5 Cir., 193 F.2d 778.

While we are not compelled to follow this construction under the Erie doctrine,[4] we do so in the firm belief that it is a logical interpretation which gives full effect to both the first and third clauses of Paragraph 5 of the 1945 lease.

Accordingly, since defendant, Hudson, began drilling operations during the primary term of the lease (as extended) which resulted in a dry hole after such term ended, the sixty-day clause operated to maintain the lease in full force and effect for an additional sixty days from June 6, 1955. If additional drilling or reworking operations were not begun during that additional period of time the lease would have expired, *unless it was maintained by some other provision of the agreement.*

■ In support of its contention that only *bona fide* drilling operations or production will maintain a mineral lease in effect beyond its primary term, plaintiff relies on several Louisiana decisions [5] which we believe to be inapplicable to the lease here under consideration. The lease agreements in those cases did not contain a sixty-day clause which extended the lease beyond the primary term. The lease in the Producers Oil case did

contain a thirty-day clause similar to the one in Paragraph 5 here, but the lessee had ceased drilling operations 53 days prior to the institution of suit by the lessor to cancel the lease. It is elementary that every lease contract must be governed by its own peculiar terms because it is the law between the parties.[6]

We now come to the more difficult question as to the effect of the unitization order which the Commissioner of Conservation issued on July 8, 1955, within the sixty-day extension of the lease following cessation of drilling operations on June 6, 1955.

■ Act 157 of 1940, regulating the conservation of mineral resources including oil, and empowering the Commissioner of Conservation to establish compulsory drilling units for the exploration and conservation of these minerals, repeatedly has been held to be a valid exercise of the police power of the State.[7] And, where property and contractual rights are in conflict with the valid orders of the Commissioner, the former must yield and are superseded by the latter.[8] However, it is only when there is actual conflict between the Commissioner's orders and the contractual provisions of a lease agreement that the latter are superseded.[9] Otherwise, the lease stands as the law between the parties.

Examining Order No. 311,[10] we find it to be the usual type of conservation ruling. The findings of the Commissioner are set forth, followed by an allocation of

4. Erie Railroad Co. v Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

5. Cooke v. Gulf Refining Co., 127 La. 592, 53 So.2d 874; Mangham v. Southern Carbon Co., 169 La. 935, 126 So. 429; Producers Oil & Gas Co. v. Continental Securities Corp., 188 La. 564, 177 So. 668; Parten v. Webb, 197 La. 197, 1 So. 2d 76.

6. Mallett v. Union Oil & Gas Corp., 232 La. 157, 94 So.2d 16.

7. Hunter Co. v. McHugh, 202 La. 97, 11 So.2d 495; Crichton v. Lee, 209 La. 561, 25 So.2d 229; Everett v. Phillips Petroleum Co., 218 La. 835, 51 So.2d 87.

8. Everett v. Phillips Petroleum Co., supra, and the cases cited therein; Smith v. Holt, 223 La. 821, 67 So.2d 93; Delatte v. Woods, 232 La. 341, 94 So.2d 281.

9. Arkansas Louisiana Gas Co. v. Southwest Natural Prod. Co., 221 La. 608, 60 So.2d 9; cf. 34 Tulane Law Review 439, *Effect of Conservation Laws and Regulations on Contracts and Mineral Leases.*

10. Counsel having failed to do so, this Court has secured a copy of the Commissioner's Order and filed it of record.

production between each separately owned tract within the drilling unit in proportion to the acreage that each tract bears to the entire area within the unit. It also provides that only one well on each unit shall be allowed to produce from the Massive Tuscaloosa Sand.

Careful scrutiny of this Order fails to reveal any provision that may be considered, expressly or impliedly, to be in conflict with Paragraph 6 of the lease held by defendant, relating to the effect of voluntary pooling at the option of the lessee. Accordingly, we must examine the lease to determine what effect, if any, the establishment of the drilling unit had upon the maintenance *vel non* of the lease after July 8, 1955.

Plaintiff argues that the lessee cannot pool any portion of the leased premises with any other property on which there is located a producing well at the time the pool is established, citing as authority Wilcox v. Shell Oil Co., 226 La. 417, 76 So.2d 416, and Mallett v. Union Oil & Gas Corp., 232 La. 157, 94 So.2d 16, 17. Both of these cases turned on interpretations of the particular lease agreements in order to determine the intention of the parties.[11] We need not be concerned here with the intention of the parties as to the time at which the lessee may exercise his option to pool for the Commissioner of Conservation has determined in his Order that the 7.58 acres under lease to defendant should, in the interest of conserving the minerals, be placed in a unit on which there is already a producing well which is effectively draining that particular geological area. If, however, we are in error in holding that we need not be concerned with the

intention of the parties, the following analysis of the lease agreement itself shows that the parties plainly and unequivocally intended to grant to the lessee an option to pool part or all of the leased premises after production was obtained on other property with which the leased premises were pooled.

Paragraph 6 begins by stating that: *"If at any time while this lease is in force and effect* lessee in its opinion deems it advisable and expedient * * *"* (emphasis supplied), he may exercise his option to pool the leased property, or any portion thereof, with other lands or leases in the immediate vicinity. Further, *"Drilling operations on or production of oil,* gas, sulphur or other minerals from any portion of the land covered hereby, shall continue this lease in force and *effect during or after the primary term* as to all of the lands covered hereby, irrespective of whether any portion thereof has been pooled. *If operations be conducted on or production be secured from* land in such pooled unit other than land covered by this lease, it shall have the same effect as to maintaining lessee's rights in force hereunder as if such operations were on *or such production from* land covered hereby, except that its effect shall be limited to the land covered hereby which is included in such pooled unit * * *"* (emphasis supplied).

In essence, the lease provides that at *any* time *while the lease is in force and effect,* the lessee has an option to pool a part or all of the leased property with any other property, and if the lessee exercises his option within that time, production from the pooled acreage, although not on the leased property, will

---

11. For example, the Court in the Mallett case stated:

"Under the terms of the lease involved in this case, the lessee is granted the right to go upon the property of the plaintiff to investigate, explore, prospect, drill, and mine for minerals. In other words, the lessee is granted the right to go upon the property and develop it in order to secure minerals. The purpose of the lease being such, any pooling agreement provided for therein must be

considered as incidental to and an aid in carrying out that purpose unless there is clear and unmistakable language contained therein to the contrary. In other words, if the right to pool with producing property is given it must be specifically set out in the lease and cannot be eked out by innuendo. The contract must be construed against the lessee for he either prepares the lease or furnishes the prepared form."

maintain lessee's rights as though the production were from the leased property itself insofar as the acreage within the unit is concerned. If the parties had intended to limit lessee's pooling option to a point of time prior to production being obtained, they would have employed the conjunctive language of "Drilling operations *and* production" rather than the disjunctive "Drilling operations *or* production"; "If operations be conducted on *and* production be secured from" rather than "If operations be conducted on *or* production be secured from"; and "if such operations were on *and* such production from land" rather than "if such operations were on *or* such production from land * * *".

 Inasmuch as Order 311 does not produce any result nor grant any right that the lease agreement does not give by way of an option to the lessee, we hold that the Commissioner's Order is not in conflict with the express provisions of the lease agreement and, therefore, does not supersede them. The drilling unit was established within the period of time provided by the lease in order to maintain the lease in full force and effect after the expiration of the 60-day extension granted by operation of Paragraph 5. We think the foregoing analysis of the lease agreement is a sufficient answer to plaintiff's contention that the pool must have been established during the primary term and prior to production being obtained from the acreage with which the 7.58 acres of the leased premises were pooled.

Plaintiff also contends that the lessee did not have the right to maintain the lease beyond the 60-day period of time granted in the extension agreement by pooling any part of the leased property. The argument is that the lease could only be maintained by production from the property under lease to defendant because the phrase "or land with which said land is pooled hereunder," found in the original habendum clause, has been deleted from the habendum clause in the extension agreement.

This argument is without merit because the whole lease was expressly ratified and confirmed in the extension agreement. Necessarily, the parties must have intended to retain the provisions of Paragraphs 5 and 6. In addition, the initial phrase of the original habendum clause reads: "Subject to the other provisions herein contained * * *". The clause then provides for the ten-year primary term. By ratifying and confirming the original lease. the extension agreement also ratified and confirmed the intention that the new habendum clause would be subject to the other provisions of the lease. If the parties had intended otherwise, they would have expressly set forth such intention in the extension agreement.

Because we believe that the original 1945 lease held by defendant is valid and in full force and effect, it is unnecessary to consider the validity of the second, 1955 lease, executed in favor of defendant. For the reasons given, plaintiff's motion for summary judgment will be denied. Upon the filing of a motion for summary judgment by defendant, it will be granted.