**J. A. HARPER, Appellant,**

v.

**HUDSON GAS & OIL CORPORATION, Appellee.**

No. 18895.

United States Court of Appeals Fifth Circuit.

Jan. 25, 1962.

James D. Sparks, Monroe, La., Thompson, Thompson & Sparks, Monroe, La., for appellant.

G. M. Bodenheimer, Jr., Shreveport, La., Bodenheimer, Looney, Richie & Jones, Shreveport, La., Patrick W. Looney, Clyde E. Love, Shreveport, La., of counsel, for appellee.

Before TUTTLE, Chief Judge, and POPE * and GEWIN, Circuit Judges.

TUTTLE, Chief Judge.

This appeal attacks the Trial Court's decision upholding the validity of the appellee's oil and gas lease. The question is whether production from a well not on the leased lands but on lands within a pooled unit which included part of the leased land sufficed to keep this particular lease in force as to the lands included in the unit.

The facts essential to our decision are not in dispute. On February 18, 1955, Hudson acquired a lease executed on April 4, 1945. It would expire on April 4, 1955 unless some steps were taken by Hudson to keep it alive. The following provisions of the lease are important here:

"2. Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date, (called the 'primary term') and as long thereafter as oil, gas or other minerals is produced from said land or land with which said land is pooled hereunder.

\* \* \* \* \* \*

"5. If prior to discovery of oil, gas, sulphur or other mineral on said land, lessee should drill a dry hole or holes, thereon, or if after discovery of oil, gas, sulphur or other mineral, the production thereof should cease from any cause, this lease shall not terminate if lessee commences operations for additional drilling or reworking within sixty days thereafter or (if it be within the primary term) commences additional drilling operations or commences or resumes the payment of rentals. \* \* \*

"6. If at any time while this lease is in force and effect lessee in its opinion deems it advisable and expedient, in order to form a drilling unit or units to conform to regular or special spacing rules issued by the Commissioner of Conservation of the State of Louisiana, \* \* lessee shall have the right, at its option, to pool or combine the lands

* Of the Ninth Circuit, sitting by designation.

covered by this lease, or any portion or part thereof, with other land, lease or leases in the immediate vicinity thereof. * * * As between the parties hereto and except as herein otherwise specifically provided, the entire acreage so pooled into a tract or unit shall be treated for all purposes as if it were included in this lease. In lieu of the royalties elsewhere herein specified, lessor shall receive, on the production from the unit so pooled, only such proportion of the royalties stipulated herein as the amount of his acreage (mineral rights) placed in the unit bears to the total acreage so pooled in the particular unit involved. *Drilling operations on or production of oil, gas, sulphur, or other minerals from any portion of the land covered hereby shall continue this lease in force and effect during or after the primary terms as to all of the lands covered hereby, irrespective of whether any portion thereof has been pooled. If operations be conducted on or production be secured from land in such pooled unit other than land covered by this lease, it shall have the same effect as to maintaining lessee's right in force hereunder as if such operations were on or such production from land covered hereby, except that its effect shall be limited to the land covered hereby which is included in such pooled unit.* * * * " (Italics supplied.)

On March 9, 1955, Hudson and the lessor executed a written agreement of extension. This provided that the lease would be "extended for a period of sixty (60) days from April 4, 1955 and so long thereafter as oil, gas, or other mineral is produced from said land." The agreement provided further that, "except as expressly changed" therein, the original lease was to "continue in full force and effect as originally written."

Hudson commenced drilling a well on the land in question on May 29. It proved to be a dry hole and it was officially abandoned on June 6, 1955. No further drilling or reworking operations were conducted on the lease premises after that date. It is not disputed that if Hudson had reworked or commenced additional drilling within sixty days thereafter, the lease would have continued in force.

Meanwhile, on April 25, Hudson had filed with the Commissioner of Conservation with the State of Louisiana, an application for field rules governing the production of oil and gas on the tract. A public hearing was held June 22 and on July 8 the Commissioner issued Order No. 311 establishing the unit, as requested, comprising 46.58 acres, effective that date. This unit was constituted of 7.58 acres of the leased lands and 39 acres of an adjacent tract on which the J. T. O'Brien No. 2 well was already producing oil in paying quantities. Hudson has tendered to appellant, successor to the mineral rights of the original lessors, his royalties based on the proportionate share which the 7.58 acres bear to the 46.58 acres of the unit. Appellant refused the tender and has sued the appellee for cancellation of the lease and for recovery of all the proceeds from production received by Hudson, for damages and attorneys' fees. The trial court entered a summary judgment for the defendant lessee. We affirm.

It would not be necessary for us to do more than make reference to the clear and able opinion of the trial court, published at 189 F.Supp. 781, were it not for reference made by both parties to subsequent decisions of the Louisiana courts, touching on the question in issue here.

The appellant makes the strongest thrust of his argument on appeal, as he did in the trial court, on the proposition that the 60-day extension agreement did not extend, during the 60-day period, that provision of the lease contract providing that the term of the contract should continue as long after ten years "as oil, gas or other mineral is produced from * * * land with which the [leased] land is pooled hereunder." This results, he says from the language of the

60-day extension agreement which said that the lease was to be "extended for a period of sixty (60) days from April 4, 1955, and so long thereafter as oil, gas or other mineral is produced from said land." Note that there was not added the following language of the original paragraph 2: "or land with which said land is pooled hereunder." As the trial court pointed out, however, since the language of paragraph 6 quoted above stated in effect that production from land with which the leased land was pooled "shall have the same effect as to maintaining lessee's rights in force hereunder as if such production [were] from land covered hereby," the omission of the quoted language in the habendum clause of the extension agreement was of no significance.

The appellant next contends that under its own terms the lease was terminated on June 6 when the dry hole was closed.[1] This termination was subject to reinstatement of the lease, under appellant's theory, only if, within 60 days thereafter, new good faith drilling or reworking occurred. The appellee argues on the other hand that the lease remained in full vigor and effect for the 60-day period during which reworking or new drilling would have the effect of continuing it in force. Further, the appellee says, the lease can be kept in force if either drilling *or production* occurs within the 60-day period; production occurred when the unit was created within the 60-day period because the unit contained a producing well, a proportionate part of whose production thereafter belonged to that part of the leased premises included in the unit; thus the lessee fully complied with its requirements under the lease.

No Louisiana cases are cited by either party, which authoritatively determine whether a failure to commence additional operations within 60 days is a condition precedent to a termination of the lease or the commencement of operations is a condition, the occurrence of which operates to revive the lease after it has already terminated. Language in cases cited by appellant to the effect that there must be actual new drilling or reworking operations within the 60-day period, Producers Oil & Gas Co. v. Continental Sec. Corporation, 188 La. 564, 177 So. 668, Seiber v. Ringgold, 231 La. 983, 93 So.2d 530 and Taylor v. Buttram, La.App., 111 So.2d 576, is not apposite because in none of these cases did the lessee tender actual production from a pooled unit as a basis of extension of the lease during the 60-day period in lieu of new drilling or reworking. Nor is the language in the Texas case, Stanolind Oil & Gas Co. v. Newman, 157 Tex. 489, 305 S.W.2d 169, cited by the trial court apposite here, because in that case there was actual new drilling within the 60-day period.

Viewing the contract as a whole, and recognizing its purpose to be to obtain production from the leased lands, we conclude that the District Court properly construed the lease as providing that it remained in full force and effect for 60 days after June 6. It would automatically end then, unless within this 60 days lessee commenced new operations, according to appellant's argument, or obtained production under some other term of the lease, according to the appellee's view. It is not disputed that no new operations were commenced. What did occur is that 7.58 acres of the lease were pooled by the Commissioner of Conservation into a unit on which there was already a producing well. The effect of this order was to give "production" in a real sense to whomever was the owner of the minerals or the right to the minerals in the 7.58 acres.

The trial court held that the production thus obtained *for* the lands pooled in the O'Brien unit constituted production *from* such lands under the provi-

---

[1]. The actual term of the extension agreement expired on June 3 or 4 (60 days from April 4), but since actual drilling operations were being conducted it was extended under the provisions of paragraph 4 until it was determined whether this drilling would end in a producer or as a dry hole.

sions of paragraph 6 above which says that if any of the leased lands are pooled, and if there is either "operations conducted on" or "production from" lands in the unit other than the lands covered by the lease, "it shall have the same effect as to maintaining lessee's rights in force hereunder as if such operations were on or *such production from lands covered hereby."* (Emphasis supplied.)

■ Having held that this term of the lease was still in effect during the 60 days of the extension agreement and thereafter for 60 days following the closing of the dry hole on June 6, we conclude that the pooling order of July 8 provided "production from" lands in the pooled unit other than the lands covered by the lease, and that the effect of this was that there was production from the 7.58 acres of the leased land which, under the provisions of the original lease agreement extended the terms of the lease so long as such production continued.

In concluding as we do, we give full recognition to, but reject, appellant's contention that production from a well within the unit but on other lands cannot count as production from the leased lands unless the well accounting for such production was brought into production after the pooling of the unit was ordered. This argument by appellant is based on the proposition that the conditions of paragraph 6, touching on the operations and production from land in a pooled unit cannot be satisfied unless the unit is created before the "operations." It has been so held in several Louisiana cases, in particular Wilcox v. Shell Oil Co., 226 La. 417, 76 So.2d 416. But, appellant says, the Louisiana Supreme Court went further in the Wilcox case, and said that operations must have occurred after unitization, and that production to satisfy a requirement like paragraph 6 here must be from a well "brought to completion," after unitization. It is true that the court did make such a determination in the Wilcox case, but it did so because the language of the contract there before the court, contrary

to what is before us, clearly required such a holding. There the language was:

"The commencement of a well or the completion of a well to production and the production of oil or gas therefrom * * * shall have the same effect, under the terms of this lease, as if a well were commenced or completed on the land embraced by this lease."

The Court held that since the well there was brought to completion before the unit was created it did not satisfy the requirement of commencement or completion of the well on an operating unit in which "any part of the [leased] land * * * is embraced." Nor did this satisfy the production requirement because the production was also not "production of oil or gas therefrom", i. e., from a well brought to completion on lands within a unit previously created.

Here this problem does not arise. The condition of paragraph 6 is twofold. This may be satisfied *either* "if operations be conducted on * * * land in such pooled unit" or "if production be secured from land in such pooled unit." Nothing here stipulates, as did the condition in the Wilcox case, that to be effective production must come from a well brought to production after the unit was formed. All that is required is that there be production from land in the pooled unit. This there was, without dispute.

Appellants, however, now press on us the Louisiana Court of Appeal decision and the affirmance of that decision by the Louisiana Supreme Court in Odom v. Union Producing Co., 129 So.2d 530, Louisiana Court of Appeal No. 45–651, Supreme Court of Louisiana, Dec. December 11, 1961, —— So.2d ——. Although some of the language of the Court of Appeal's decision indicates that there is no significant difference between the lease provisions in the Wilcox case and those of Odom (identical with paragraph 6 of this lease) it is plain that the court meant that there is no significant difference so far as to permit a different result on the facts presented in the Odom case.

It is highly significant that in Odom, at the date of termination of the lease, there had been no drilling on the leased land; there had been a well drilled on the adjacent land which was later unitized with the leased land; but this well, in the unit, but not on the leased lands, *had been shut-in* on the date of the termination of the lease; therefore there was no operation to keep the lease alive and *there was no production.* The Court of Appeals said as the ratio decidendi of its decision:

> "There were neither operations conducted on nor production secured from either the leased land or lands, of the unit after formation * * * *and prior to the expiration of the defendant's lease."* (Emphasis supplied.)

Thus it is clear that the principle of the Wilcox case so far as it related to production after the unitization from a well completed before unitization was not passed upon because, in point of fact, there was no production of any kind until after the lease had expired. The Court in Odom held that a later tender of shut-in rental from the well in the unit by the lessee was not effective to keep the lease alive because the paragraph of the lease permitting the payment of shut-in rentals in lieu of production did not expressly authorize the treatment of shut-in rentals from off-the-lease wells in pooled units as the equivalent of either operations or production, although the lease did expressly equate shut-in rentals from wells on the leased property with drilling operations or production, for keeping the lease alive.

The Supreme Court of Louisiana affirmed the judgment of the Court of Appeal in the Odom case. In doing so, it placed its decision on the proposition just mentioned, that is, that the provisions of the lease whereby shut-in rentals could be substituted for drilling operations or for actual production related only to operations or completed and shut-in wells on the leased property itself. The Court said:

> "In order to continue the instant lease under the circumstances of the case beyond its primary term by the completion of a shut-in well on the voluntary [pooled] unit, operations had to be conducted on the land of the lessors."

The court found it unnecessary to determine whether the principle enunciated in the Wilcox case would be applicable to the lease before it. Significantly, the court said:

> "Because of our conclusion, supra, we do not find it necessary to pass on whether or not the case of Wilcox v. Shell Oil Co., 226 La. 417, 76 So.2d 416, is apposite."

It is clear therefore that neither the Court of Appeal nor the Supreme Court of Louisiana dealt with the question which we have here for decision. We conclude, therefore, that there is no decided case in Louisiana that says that where a lease contract provides that it may be kept in existence as long as there is production from land in a pooled unit other than the land covered by the lease, without more, such production, to have such effect, must be from a well completed after the unit was created. The language of the condition here for decision leads irresistably to the opposite conclusion. Production was secured in this case from land, outside the lease, but within the unit of which the 7.58 acres were a part. Under the terms of the contract providing that "if * * * production be secured from land in any pooled unit other than land covered by this lease, it shall have the same effect as to maintain lessee's rights in force hereunder as if * * * such production [were] from the land covered hereby", this production served to keep the lease in existence so long as it continues.

Because of the view we take on the construction of these terms of the lease we do not find it necessary to discuss the subsidiary matters presented by appellant on appeal, although each of them has been fully considered.

The judgment is

Affirmed.