Edwin C. BOUTTE et al.

v.

CHEVRON OIL COMPANY.

Civ. A. No. 67–1568.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Aug. 4, 1970.

Paul Tate, Mamou, La., and Charles C. Jaubert, Trial Atty., Lake Charles, La., for plaintiffs.

Lawrence K. Benson, Trial Atty., John C. Christian, Charles A. Snyder, Milling, Saal, Saunders, Benson, & Woodward, New Orleans, La., for Chevron Oil Co. and defendant and third-party plaintiff.

Richard L. Latimer, Baton Rouge, La., for State Mineral Board, Third-party defendant.

MITCHELL, District Judge.

This cause came on for trial on June 15, 1970, and, considering the evidence presented and the stipulations entered into by counsel for the parties, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

#### I

This is a class action, under Rule 23 of the Federal Rules of Civil Procedure, properly brought on behalf of approximately 1830 owners in indivision to set aside a mineral lease which was executed on February 24, 1960 by the Mineral Board [1], on behalf of the heirs of Francois Zenon Boutte, to the defendant, Chevron, pursuant to Act 513 of 1952 of the Louisiana Legislature which permits the Mineral Board to lease such property, when it is owned by more than 500 persons in indivision, in the same manner as state owned lands. The 253 acre tract in question is a strip of land that had not been disposed of by Francois Zenon Boutte and was held to belong to his heirs.[2]

Not all of the plaintiffs are Boutte heirs. For example, Fritz J. Muller purports to own mineral leases executed by some of the Boutte heirs in 1966, subsequent to the Chevron lease, and he also claims to own an undivided interest in the lands covered by Chevron's lease.[3]

The initial consideration for the Chevron lease was $103,753.67, with delay rentals of $51,876.84 per annum.[4]

Plaintiffs aver that Chevron's lease expired on February 24, 1961 for the following reasons: [5]

1—That no actual drilling or mining operations were commenced on the leased premises or delay rentals paid on or before February 24, 1961.

2—That the unitization of parts of the leased property before February 24, 1961 into the "E. P. Brady, et al—Boutte Heirs Unit #1" and into the "8400 Foot Sand Unit No. 1" by Order No. 118–B of the Louisiana Commissioner of Conservation was improper.

Alternatively, plaintiffs want Chevron's lease cancelled because:

3—Plaintiffs claim Chevron failed to pay royalties as provided under

---

1. Louisiana State Mineral Board. Additionally, the following abbreviations are used herein: Department=Louisiana Department of Conservation; Commissioner=Commissioner of the Louisiana Department of Conservation; Chevron=Chevron Oil Company; United=United Gas Pipe Line Company; Southern=Southern Natural Gas Corporation; FPC=Federal Power Commission.

2. Dugas v. Powell, 228 La. 748, 84 So.2d 177 (1955).

3. Pre-trial Order, p. 6.

4. See lease attached to plaintiffs' petition, Vol. 1.

5. See Pre-trial Order, pp. 5–6.

paragraph 6 of the lease, for reasons alleged.

4—Unreasonable delay in paying the first royalty more than ten months after initial production, without any just reason therefor.

5—Plaintiffs finally claim that Chevron did not fulfill its obligation under paragraph 6 of the lease due to the fact that Chevron sold the gas produced to pipeline purchasers for a higher price than for which it accounted to plaintiffs, including various costs, and that it accounted to plaintiffs at a lower price, including deduction of various costs, that should have been paid by Chevron.

Between February 24, 1960 and February 24, 1961, two producing units were drilled on property which had been unitized with the Boutte lease.

The first unit, E. P. Brady et al—Boutte Heirs Unit No. 1, was a voluntary unit created in March of 1960, on which production commenced in the same month. Plaintiffs contend that the Mineral Board lacked the power and authority to enter into this unitization agreement.

The second unit, a Commissioner's unit, was created by the Department on February 1, 1961 by Order No. 118–B issued under the Louisiana Conservation Statute, L.S.R. 30:1 et seq. By minute entry of March 10, 1969, this Court held the unit was not to be subject to collateral attack by plaintiffs.[6] The parties have stipulated that the well for this unit has been in continuous gas production since February 2, 1961. However, Exhibits "P–21" and "C–13", which granted to Chevron "Authority to Produce" from this well were issued by the Department by document dated March 20, 1961.[7]

## II

Subsequently, the Department issued Order No. 584–A–2, effective February 16, 1967. This order superceded the E. P. Brady et al—Boutte Heirs Unit No. 1, the voluntary unit, and divided it into two producing units.[8]

## III

All orders of the Commissioner involving the Boutte acreage were validly issued and no evidence was offered nor objection made by the Boutte Heirs to any proposal presented by Chevron at any of the hearings.

## IV

While the respective unit wells are located upon the respective areas designated as unitized areas, none are located upon Boutte land covered in Chevron's February 24, 1960 lease.[9]

## V

The parties have stipulated that gas sold in intrastate commerce is sold for 13 cents per thousand cubic feet (mcf).

## VI

As gas sold by Chevron to Southern is resold in interstate commerce, its price is subject to regulation by the FPC.

## VII

Since April 1, 1959, Chevron has received 23.675 cents per mcf for gas delivered to Southern. Under FPC order issued June 4, 1959, the difference in price of 10.675 cents per mcf is not final, but is subject to refund to Southern if and when ordered by the FPC, and Chevron (as required by the FPC order) has executed an agreement to do so.

## VIII

The FPC has not finally approved any price above 13 cents per mcf, the price

6. See Savoy v. Tidewater Oil Co., 218 F. Supp. 607 (WD La.–1963) aff'd 326 F.2d 757 (CA 5–1964).

7. Pre-trial Order, Facts Stipulated by Counsel, p. 14.

8. Pre-trial Order, Facts Stipulated by Counsel, p. 16.

9. Pre-trial Order, Stipulation of Counsel, p. 16.

initially stipulated in an agreement entered into by Chevron and Southern on July 31, 1951.

## IX

The initial price of 13 cents per mcf consisted of 12 cents per mcf for gas and 1 cent per mcf for the Louisiana gas gathering tax imposed by L.R.S. 47:671. This tax was increased to 2 cents per mcf by Act 8 of 1958 (L.R.S. 47:678) and, the 1951 agreement between Southern and Chevron, was amended to increase from 1 cent per mcf to 1.5 cents per mcf the tax reimbursement.

## X

The gas gathering tax was not levied against royalty owners but was imposed on Chevron as an excise tax for the privilege of being "engaged in gathering gas produced in this state".[10]

## XI

Consequently, no portion of that gathering tax was at any time charged by Chevron to royalty owners under applicable leases, and no royalties were due on the 1 cent or 1.5 cents per mcf paid by Southern to Chevron as reimbursement for the gas gathering tax levied and paid entirely by Chevron.

## XII

Under the terms of the 1951 agreement between Chevron and Southern, the gas gathering tax reimbursement of 1.5 cents ceased on December 1, 1958 (Act 3 of Extraordinary Session of 1958, L.R.S. 47:681.1), and a reimbursement of 1 cent per mcf for the gas severance tax commenced. Accordingly, the tax reimbursement under the 1951 agreement for the first time became a reimbursement for the gas severance tax, as distinguished from the gas gathering tax. (Act 2 of Extraordinary Session of 1958, L.R.S. 47:633).

## XIII

Under the Louisiana severance tax law, the gas severance tax is payable by both royalty owners and mineral lessees. Therefore, Chevron charged the royalty owners the full 2.3 cents mcf severance tax on royalty gas, and simultaneously included the 1 cent per mcf severance tax reimbursement in the computation of gas royalties under applicable leases.

## XIV

Chevron applied to the FPC for approval of an increased rate of 23.675 cents and, on June 4, 1959, the FPC entered an order permitting the increased rate to become effective April 1, 1959, without, however, approving the rate, and subject to the limitation that

> "Chevron shall, in accordance with its agreement and undertaking, refund at such time and in such amounts to the parties entitled thereto, and in such manner as may be required by final order of the Commission, the portion of the increased rates found by the Commission in this proceeding not justified, *together with interest thereon * * *.*" (Italics added.)

## XV

Under the February 24, 1960 lease of the plaintiffs' property, Chevron computed royalties on gas sold to Southern on the basis of the only price definitely approved by the FPC, 13 cents per mcf, consisting of 12 cents per mcf payment for gas and 1 cent per mcf reimbursement for severance taxes. Chevron withholds royalties on the refundable portion of the 23.675 cents total, i. e., 10.675 cents per mcf, pending final rate order approval by the FPC, and it so notified its royalty owners, through the Mineral Board, by letter dated April 17, 1959.[11]

## XVI

In addition, small quantities of gas sold to Southern are not subject to the

---

10. L.R.S. 47:673(B).

11. Exhibit C-26.

Louisiana severance tax and Chevron receives no tax reimbursement from Southern on account of such tax. For this gas, Chevron is paid by Southern the sum of 21.5 cents per mcf, of which 12 cents per mcf is approved by the FPC and 9.5 cents per mcf is subject to refund. Chevron is computing royalties on this gas at 12 cents per mcf, and withholding royalties on 9.5 cents per mcf which is subject to refund, pending final rate order of the FPC.[12]

## XVII

Sales of gas by Chevron to United are made at Chevron's Barataria Station. Under the June 14, 1946 contract between Chevron and United, as amended, the contract price fluctuated. As of February 24, 1960, the price was 20 cents per mcf, plus 1.875 cents per mcf tax reimbursement. On July 1, 1964, the price dropped to 20 cents per mcf plus 1.75 cents per mcf tax reimbursement. Commencing May 1, 1967, under the new contract effective that date, the price is 20.625 cents per mcf, which includes the severance tax, subject to adjustment prospectively to the area rate for gas well gas, if and when such rate prescribed by FPC becomes final, and subject to adjustment retroactively to the area rate for gas well gas, but not less than 20 cents per mcf nor more than 21.625 cents per mcf.

## XVIII

No proceedings have been instituted or initiated against the Mineral Board or the Commissioner in any state district court by plaintiffs or by the heirs of Francois Zenon Boutte or by any other person claiming to be aggrieved, to review, alter, modify, rescind or set aside any agreement, declaration or order relating to pooling, integration or unitizing of the February 24, 1960 Boutte heirs lease, either in whole or in part.

## XIX

No proceedings have · been instituted or initiated against the Mineral Board by plaintiffs or by the heirs of Francois Zenon Boutte or by any other person claiming to be aggrieved, as to any matter involving the supervision or administration of Chevron's February 24, 1960 Boutte lease, except to obtain distribution of funds derived therefrom.

## XX

In regard to deductions, the reason why various deductions were not charged against the State's royalty under State Lease No. 639 is that said lease was granted on an earlier State lease form which contained the provision that "no gathering or other charges are made chargeable to lessor", but that provision was not contained in the regular State lease form in use by the Mineral Board in leasing State lands when the Boutte Heirs' February 24, 1960 lease was granted; and it is not contained in the February 24, 1960 lease or in any other lease included in any units except those pertaining to State lands.

## XXI

Hence no deduction for "merchantable or extraction cost" was charged against the State's royalty interest attributable to State Lease No. 639, covering the State's portion of the property, within any unit which also included property of the plaintiffs. However, this deduction was charged against the royalty owners share attributable to all other leases in each unit.

## XXII

Chevron has always paid royalties on the February 24, 1960 Boutte lease on a unitized basis and none of the plaintiffs questioned the royalty payments by Chevron on any basis until 1966 or 1967, after some of the Boutte heirs purportedly granted mineral leases of their un-

12. Pre-trial Order, Stipulation of Fact between Counsel, pp. 19, 20.

divided interests to plaintiff Fritz J. Muller. No royalty owner has rejected any royalty payment for alleged improper unitization or for any other reason.

## XXIII

The nine and a half month delay in paying the first royalty was justifiable and occurred neither through the neglect nor fault of Chevron. It was due to the confusing situation which developed with the change of State Administrations and resulting change of membership of the Mineral Board in 1960, the repeal of Act 513 of 1952, the fact that no meetings were held for four months by the Mineral Board and the mistake of the Mineral Board as to which unit the division order submitted by Chevron in May of 1960 applied. Despite this confused situation, Chevron paid royalties in December of 1960, although the division orders had not been signed by the Board.

## CONCLUSIONS OF LAW

### I

Jurisdiction is proper under 28 U.S.C. § 1331, inasmuch as the required diversity of citizenship exists and the amount in controversy exceeds $10,000.

### II

 This is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; the class is adequately represented and any judgment entered herein will bind all members of the class.

### III

The Mineral Board has full supervision of the February 24, 1960 Boutte Heirs' lease, the subject matter of this action.[13]

13. L.R.S. 30:129.

14. See Savoy v. Tidewater Oil Co., *supra*, aff'd 326 F.2d 757 (CA 5–1964).

15. Sec. 9 of the lease provided that "Lessee may, with the consent and approval of the State Mineral Board, acting for Lessor, pool or combine the acreage of this

### IV

 The voluntary unit, E. P. Brady et al—Boutte Heirs Unit No. 1, was validly formed on March 1, 1960. The units created by the Commissioner cannot be collaterally attacked.[14]

### V

The Mineral Board was authorized to execute the Pooling and Unitization Agreement dated March 17, 1960, and Section 9 of the Chevron lease authorized the pooling.[15]

### VI

This case is distinguishable from Wilcox v. Shell,[16] because the voluntary pooling and unitization agreement relied on by defendant Chevron stated that "Drilling, mining, or reworking operations or production of minerals from any part of the Unit shall be treated for all such purposes of said lease as such operations upon or such production from said lease and shall serve to maintain said lease in force as if conducted or produced from said lease".[17]

In Harper v. Hudson Gas & Oil Corporation,[18] the District Court held:

"In essence, the lease provides that at *any* time *while the lease is in force and effect*, the lessee has an option to pool a part or all of the leased property with any other property, and if the lessee exercises his option within that time, production from the pooled acreage, although not on the leased property, will maintain lessee's rights as though the production were from the leased property itself insofar as the acreage within the unit is concerned. If the parties had intended to limit lessee's pooling option to a point of time prior to production being ob-

lease, or any portion thereof, with any other property, lease, or leases, or portions thereof".

16. 226 La. 417, 76 So.2d 416 (1954).

17. Exhibit D-1.

18. 189 F.Supp. 781 (WD La.–1960), aff'd 299 F.2d 238 (CA 5–1962).

# 530

tained, they would have employed the conjunctive language of 'Drilling operations *and* production' rather than the disjunctive 'Drilling operations *or* production'; 'If operations be conducted on *and* production be secured from' rather than 'If operations be conducted on *or* production be secured from'; and 'if such operations were on *and* such production from land' rather than 'if such operations were on *or* such production from land * * *."
(Emphasis added.)

with which holding we concur.

## VII

■ Production from the E. P. Brady et al—Boutte Heirs Unit No. 1, drilled before the February 24, 1960 Chevron lease was granted, but not completed or produced until after said lease was granted, prevented expiration of the Chevron lease on February 24, 1961.[19]

## VIII

The Mineral Board acted in accordance with the recommendations of John F. Madden, Assistant to the Attorney General, who was assigned to the Mineral Board for legal matters, who received information that the unit was validly formed as to the Boutte tract. The Attorney General is by statute the attorney for the Mineral Board.[20]

## IX

■ Production from the E. P. Brady et al Unit 5—No. 2 Well, drilled before the February 24, 1960 lease was granted on land later unitized with the Boutte lease, also prevented expiration of the Boutte lease on February 24, 1961,[21] be-

cause production thereon, in paying quantities, began February 2, 1961.

## X

Chevron maintained the February 24, 1960 Boutte Heirs' lease by unitization and production, eliminating the necessity for payment of delay rentals on or before February 24, 1961.

## XI

■ Under the well established jurisprudence of the State of Louisiana, the mineral owner-lessor is not entitled to cancellation when adequate reason for the delay in paying royalties is shown.[22]

## XII

■ Chevron used the proper basis for payment of royalties under the February 24, 1960 lease. Specifically, (a) the nine and a half months' delay in payment of the first royalty was justifiable; and (b) Chevron was authorized under the lease and the division orders to deduct "extraction and/or merchantable costs".

## XIII

■ A judgment which would impose on Chevron an obligation to pay royalties on that part of the funds received from the sale of gas which is subject to possible refund to pipeline purchasers, before Chevron's refund obligation has been determined by final order of the FPC, would deprive Chevron of its property without due process of law and subject it to a multiplicity of legal actions. Therefore, Chevron's calculation of the

19. Harper v. Hudson Gas & Oil Corporation, supra. Production commenced in March, 1960.

20. L.R.S. 30:132.

21. Harper v. Hudson Gas & Oil Corporation, supra.

22. Fontenot v. Sunray Mid-Continent Oil Co., 197 So.2d 715, 716 (La.App.1967, writs ref.). Further, in Louisiana the right to dissolve a lease is subject to judicial control according to the circumstances. Davis v. Laster, 242 La. 735, 138 So.2d 558 (1962).

payment of royalties to plaintiffs is correct.[23]

White Hall Oil Co. v. Boagni [24] is distinguishable on its facts, particularly in view of the fact that the lease in that case provided that:

> "In any case where Lessee sells gas or plant products of his and Lessor's, Lessor shall receive the same price and terms as Lessee * * *."

### XIV

 By their actions, the plaintiffs themselves have approved, acquiesced in, ratified and confirmed the February 4, 1960 lease and all unitization agreements and orders unitizing part of the Boutte property.

### XV

Some of the plaintiffs, purportedly acting for the heirs of Francois Zenon Boutte, by denying the validity of Chevron's lease relieved Chevron of an obligation to conduct additional drilling or development operations.[25]

### XVI

In the event that the FPC approves the provisionally increased rates or any part thereof, interest shall be due and payable, at the rate finally adopted by the FPC, to the royalty owners on the difference between any increase in rate, as finally determined by the FPC, and the amounts previously paid to the royalty owners.

Let judgment be entered dismissing with prejudice plaintiffs' suit at their cost. Further, let judgment be entered denying third-party plaintiffs' alternative demands.

---

23. Ashland Oil & Refining Co. v. Staats, Inc., 271 F.Supp. 571 (D.Kan.–1967).

24. 255 La. 67, 229 So.2d 702, 705 (1969).

25. Cutrer v. Humble Oil & Refining Co., 202 F.Supp. 568 (ED La.–1962) aff'd 309 F.2d 752 (CA 5–1962).